**RICHMOND, F. & P. R. CO. v. McCARL,
Comptroller General.
No. 5631.**

Court of Appeals of the District of Columbia.
Argued October 7, 1932.
Decided Nov. 21, 1932.

204

Henry W. Anderson, of Richmond, Va., and W. G. Brantley, of Washington, D. C., for appellant.

R. L. Golze and O. R. McGuire, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

This is an appeal from a decree entered by the court below sustaining a motion of appellee to dismiss the bill of complaint. The bill prayed for a permanent injunction restraining and enjoining appellee from withholding certain moneys due appellant by the government of the United States for transportation and other services performed by appellant, including the carrying of mail, passengers, and freight, and also restraining appellee from applying such moneys, as well as such future earnings for such transportation services, to the payment of an amount alleged to be due by appellant to the Interstate Commerce Commission as excess income under section 15a of the Interstate Commerce Act, as amended by the Act of Feb. 28, 1920, 41 Stat. 488, § 422, title 49, USCA § 15a.

As appears from the bill, the Interstate Commerce Commission entered an order directing appellant to pay approximately $700,000 on account of excess income for the years 1922 and 1923. The order of the Commission had no other purpose and embraced no other subject than the recapture of the amount noted. At the time the bill was filed, the United States was indebted to appellant in the sum of $71,453.39 for transportation services rendered the United States. About half of this amount was due for carrying the mail. Since the bill was filed (November 11, 1931), the sums due appellant by the United States for the same character of service have continued to accumulate, and have remained unpaid, and now aggregate a sum in excess of the amount covered by the order of the Commission.

The position of the appellant on this appeal is that neither appellee nor any other officer of government has authority to withhold payment for services rendered by appellant to the United States, as an offset against excess income found by the Interstate Commerce Commission to be due by appellant under the terms of section 15a of the act, because the United States have no beneficial interest or right as creditor in such moneys; that the same are not public funds of the United States; and that, even if it be admitted that such excess income moneys are due and payable by appellant, the United States have no beneficial interest therein and are trustees of such moneys, and the same may not, therefore, be set off against the direct indebtedness of the United States incurred in their behalf.

The lower court was of opinion both that the Comptroller General (appellee) had the right to refuse to direct payment of plaintiff's transportation earnings, and also to set off the same against the amount claimed to be due under the recapture provision of the act, but also held that appellant had an adequate remedy by suit to set aside the Commission's order in a three-judge court, or to recover the amount of its claim against the United States in an action in the Court of Claims.

Admittedly at the time the suit was decided below neither the United States nor the Interstate Commerce Commission had begun any legal proceedings to collect the sum found by the Commission to be due from appellant under the Transportation Act, but, in the argument in this court, it was stated by counsel for both interests that such suit had then been brought in a court of competent jurisdiction on behalf of the United States, in which the Interstate Commerce Commission had joined as a party plaintiff.

The question, therefore, for decision is whether the United States may refuse to pay a debt which is admittedly due appellant unless and until appellant pays the United States an amount found due by the Interstate Commerce Commission in recapture proceedings under section 15a of the act as "excess profits."

We think it may be properly assumed that, if excess income moneys are not public moneys in any sense, the United States may not assert such an indebtedness from a railroad as a justification for refusal to pay a debt admittedly due by it to the railroad, and this makes it necessary to consider the legal status of such moneys.

The provisions of section 15a which have a bearing on the question are as follows:

Paragraph 5 declares: " * * * Any carrier which receives such an income so in excess of a fair return, shall hold such part of the excess, as hereinafter prescribed, as

trustee for, and shall pay it to, the United States."

Paragraph 6. "If, under the provisions of this section, any carrier receives for any year a net railway operating income in excess of 6 per centum of the value of the railway property held for and used by it in the service of transportation, one-half of such excess shall be placed in a reserve fund established and maintained by such carrier, and the remaining one-half thereof shall, within the first four months following the close of the period for which such computation is made, be recoverable by and paid to the commission for the purpose of establishing and maintaining a general railroad contingent fund as hereinafter described. * * *"

Paragraph 10, following, describes the fund as a "revolving fund" to be administered by the Commission in the furtherance of the public interest in railway transportation through loans to carriers to meet expenditures for capital account, or to refund maturing securities originally issued for capital account, or by purchasing transportation equipment and facilities and leasing the same to carriers. The money so loaned or expended for the benefit of the general transportation system is required to be repaid and returned to the revolving fund, and thus apparently to continue on indefinitely and for the purposes mentioned.

The Supreme Court has declared these provisions of the Transportation Act constitutional. Dayton-Goose Creek Ry. Co. v. United States, 262 U. S. 456, 44 S. Ct. 169, 174, 68 L. Ed. 388, 33 A. L. R. 472. That was a case in which the railroad brought suit to restrain the application of the recapture provisions against it by civil or criminal proceeding, and it was urged on its behalf that the income produced in the use of the railroad property was private property protected by the Fifth Amendment; that the returns and charges authorized by the Commission must be assumed to be reasonable and just, and as such the carrier was entitled to collect them and to use them as any other private property; that Congress had no power to compel a shipper to pay unreasonable rates, and the carrier no right to collect an excess service charge and hold this as trustee for the United States; and that, since the so-called excess revenues claimed to be due by the carrier in that case were collected as a reasonable charge for services rendered, such earnings were private property of the carrier which it was not possible for Congress to change into a trust fund for the United States, or for any other purpose. This argument was rejected by the Supreme Court as unsound, on the ground that the object sought by Congress in framing the Transportation Act, including the provisions of section 15a, was to maintain, as Congress had a right to do, an adequate national railway system, and that the provisions referred to in paragraphs 6 to 15 of that section were plainly adapted to that end. Chief Justice Taft, speaking for the court, said:

"We have been greatly pressed with the argument that the cutting down of income actually received by the carrier for its service to a so-called fair return is a plain appropriation of its property without any compensation; that the income it receives for the use of its property is as much protected by the Fifth Amendment as the property itself. The statute declares the carrier to be only a trustee for the excess over a fair return received by it. Though in its possession, the excess never becomes its property, and it accepts custody of the product of all the rates with this understanding. It is clear, therefore, that the carrier never has such a title to the excess as to render the recapture of it by the government a taking without due process.

"It is then objected that the government has no right to retain one-half of the excess, since, if it does not belong to the carrier, it belongs to the shippers and should be returned to them. If it were valid, it is an objection which the carrier cannot be heard to make. It would be soon enough to consider such a claim when made by the shipper. But it is not valid. The rates are reasonable from the standpoint of the shipper as we have shown, though their net product furnishes more than a fair return for the carrier. The excess caused by the discrepancy between the standard of reasonableness for the shipper, and that for the carrier due to the necessity of maintaining uniform rates to be charged the shippers, may properly be appropriated by the government for public uses because the appropriation takes away nothing which equitably belongs either to the shipper or to the carrier. Yet it is made up of payments for service to the public in transportation, and so it is properly to be devoted to creating a fund for helping the weaker roads more effectively to discharge their public duties."

██ This "excess" which the Supreme Court says does not belong to the carrier nor to the shipper, and which the lower court in that case ([D. C.] 287 F. 728, 732) said was "in effect an excise tax," is not, we think, a tax

which, like other taxes, is payable into the Treasury of the United States for ordinary governmental uses, and, in this view, we think it clear the United States, under the provisions of the act, possess no direct beneficial interest in the fund, that is to say, in the sense in which they control the public revenues, but that in the same manner as is declared in paragraph 5 the carrier shall hold it "as trustee," so the United States, through the instrumentality of the Interstate Commerce Commission, holds it, when and as it is paid, as trustee and upon the trusts named in the Transportation Act. These trusts, as we have seen, authorize the Commission to use it for loans to the weaker carriers or to the purchase of railway equipment and facilities for their benefit. The act provides that the fund shall be under the control of the Commission and be used by that body in accordance with the purposes of the act, and these purposes are clear and explicit. But, while it is payable to the Commission, and the Commission is required to collect it, and while its disbursement is under the supervision of the Commission, the Commission as such acts as an instrumentality of the United States. It is, as we think and as was stated by the Supreme Court, an appropriation by the United States of a fund which, for the purposes expressed in the act—i. e., public uses—they have the right to pre-empt and control. It is money, therefore, which the carrier has collected and holds as trustee for the United States, and which the United States have a right to demand and receive likewise as trustee, and though it is not moneys which should, or may be covered into the Treasury under section 3617, R. S. (title 31, USCA § 484), or withdrawn therefrom under section 305, R. S. (title 31, USCA § 147), which two sections relate to the manner in which funds belonging to the United States shall be deposited and withdrawn from the Treasury, and, though the language of the act clearly shows that the fund should not be administered or controlled by the Secretary of the Treasury in the ordinary method relating to public funds, but should be administered by the Interstate Commerce Commission, the fact remains that the money is payable, if properly due, to the United States, and is subject to such disbursement and control "for public uses" as Congress may declare. In our view, therefore, it is of no consequence whether its "recovery" should be had at the instance of the Interstate Commerce Commission as a body corporate or at the instance of the United States as trustee. The source of power in either case is the same,

and it would make no difference, when recovered, by whom its administration should be controlled. The obligation to see to its right control and right disbursement is the obligation of the United States.

But it is urged on behalf of appellant that, admitting all of this, there is still no right of set-off against a trust fund for the trustee's personal debts. That this is the rule between private parties is, of course, fundamental, and it is also true that ordinarily the rules of law which apply to the government and to individuals are the same.

But that is not this case. Here, as we have undertaken to show, the excess earnings of a carrier are money which the carrier has collected, not in its own right, but as trustee for the United States. While it holds the money, it holds it as trustee for the United States. When it is paid over, it is held by the United States as trustees under the provisions of the act of Congress through which it is created, and it is subject to the trusts which Congress has attached to it. It is not, therefore, public moneys in the sense in which the ordinary revenues of the government are public moneys, but it is nevertheless public moneys in the sense that it is a fund which the United States control and which, through an instrumentality of the United States created by Congress, they disburse. It is therefore clearly moneys which the United States are charged with the duty of conserving. This, we think, was in principle decided by the Supreme Court in Minis v. United States, 15 Pet. 423, 448, 10 L. Ed. 791. In that case, Minis was a surgeon in the Army of the United States, and was directed to aid in the removing of the Cherokee Indians from their country to the new country assigned to them beyond the Mississippi. While thus engaged, he disbursed large sums of money which the United States held as trustees for the Indians. He claimed and collected a commission on the sums so disbursed, chargeable out of the Indian fund, and this claim was resisted by the United States under the statute which then provided that no officer of the army should receive any compensation on account of disbursing any public money, etc. One of the questions, therefore, was whether this fund in the hands of the government as trustee for the Indians was public money, as to which Mr. Justice Story, speaking for the court, said: "It has also been suggested, that the disbursements in the present case were not properly of public money, because it was money stipulated by treaty to be paid to the Cherokees, upon their removal and the cession of their lands. But we think this ob-

jection is unmaintainable. The payments made were properly public money, and the disbursements thereof were on account of the United States, and for their use and benefit, in fulfillment of the obligations of the treaty."

■ From this we think it follows that whenever—but not until—the amount claimed to be due from the carrier is legally ascertained, as by the judgment of a court, it becomes a claim of the United States which may be legally used to set off a debt due the carrier by the United States.

■■ And this brings us to consider whether in the present instance appellee was warranted in withholding appellant's money on the ground that the order of the Commission established a valid set-off. The proceeding of the Commission, as the result of which it found that appellant was subject to recapture in the sum of approximately $700,000, was administrative and not judicial. Neither in the act, nor in any section thereof, is the Commission empowered to make a finding of this nature conclusive against the carrier. It is without the power of a court to enter a judgment. The legal effect of the order therefore is no more than a bookkeeping ascertainment by the Commission of an indebtedness due by the carrier. To give it finality, it was necessary it should be reduced to judgment. Here, as we have already seen, appellant denied its indebtedness to the United States and likewise declined to consent that such indebtedness, or any part thereof, might be set off against the debt asserted against it by virtue of the Commission's order. In such circumstances it was the duty of the United States, in the execution of its trust under the Transportation Act, to commence legal proceedings to secure a judgment for the money found by the Commission to be due under the recapture clause of the act, for, as we have seen, in no other way could such indebtedness be finally determined either as to validity or amount, and until so determined it was not a valid set-off. Here, as we have seen, the services appellant rendered the United States are admitted. The amount due therefor is not contested, and so we have a case in which the United States owe appellant money which the Comptroller General refuses to pay because of an unsettled and unliquidated claim of the United States against appellant. This may not be done. There is, however, a statute of the United States which provides a right and a remedy. It authorizes the United States to withhold payment in any case in which an allowed claim is presented to the Treasury for payment (and appellant's is

such a claim), where the United States has a counterclaim, until suit can be instituted on the counterclaim and pressed to final judgment. Act March 3, 1875, c. 149, 18 Stat. 481, title 31 USCA § 227. This statute, we think, was the chart which should have guided the Comptroller General in the procedure to be taken in this case, for otherwise we should have to concede to that officer the power of determining and settling an indebtedness of a citizen of the United States without trial, the examination of witnesses, or the other safeguards of judge and jury which in our system of government are guaranteed. Had the United States in the first instance availed themselves of the right and remedy provided by the statute, the delay of a year which has resulted would have been avoided, and the rights of the parties as between themselves would likely have been settled without further recourse to the courts.

But appellee insists that there was no obligation on the United States to press the order of the Commission to judgment, but, on the other hand, a duty on appellant, if dissatisfied with the order, to resort to a three-judge court in an effort to have it set aside, or to the Court of Claims to recover judgment against the United States for the amount of their indebtedness to it.

We are not impressed with this position in either respect. That resort by appellant to a three-judge court was open to it to question an order solely to pay money, even if conceded, which is going a long way, is not conclusive, for, the order of the Commission not being self-executing, appellant was under no legal obligation to have it reviewed until it was sought to enforce it, and this we think required something more than the order itself. Appellant was asking nothing more than the payment of an admitted debt. Appellee sought to avoid payment on the ground of indebtedness to the United States. The duty of establishing the counterclaim and the legality of the set-off was therefore, in the circumstances, an obligation, not of appellant, but of the United States.

And so, in like manner, we think the suggestion of resort to the Court of Claims by appellant without merit. The debt to the carrier, as we have seen, is not disputed either as to amount or that it was then due and payable. A judgment of the Court of Claims would therefore merely have established something which is not contested.

■■ This leaves for our notice only the additional point made by appellant that, since part of the debt due to it was for carrying the

mail, and since the law requires it to perform this service, the failure to make or provide for payment is a taking of private property for public use without the payment of just compensation. But the answer to this is obvious. Congress has in fact appropriated the money to pay for carrying the mail, and there is now in the Treasury of the United States a fund for the payment of this service, and the payment itself would follow except for the claim of the United States of a valid set-off. It is now the settled law that, where reasonable, certain, and adequate provision is made at the time of the taking to ascertain and secure the compensation to be made to the owner, the taking does not violate the terms of the Fifth Amendment. Joslin v. Providence, 262 U. S. 668, 677, 43 S. Ct. 684, 67 L. Ed. 1167. The declaration frequently made on this subject by the courts that, in addition to adequate provision for payment, there should also be prompt payment, presupposes a right on the part of the claimant to receive the money. Where that right is disputed as by a counterclaim, there is no violation of the constitutional provision in the delay of payment pending the determination of the validity of such counterclaim.

The conclusion from what is said above is that at the hearing below the trial court should have put appellee on terms either to comply with the statute (18 Stat. 481) or suffer the injunction to issue. The purpose of the suit was not to challenge the discretion of the Comptroller General, but rather to challenge his authority to withhold a sum of money admitted to be due and payable. In such a case it is not necessary to join the United States. But, as we have already seen, since the appeal was taken, the United States and the Commission, as parties plaintiff, have instituted a suit to make effective the order of the Commission finding the appellant chargeable with excess earnings and to secure judgment for the amount thereof. In these circumstances, we think we should have regard to the condition as we find it now, and that no injunction should issue pending the determination of the proceeding, which, as we have seen, has now been duly begun under the provisions of the statute.

This, of course, does not mean that the Comptroller General is authorized or should withhold moneys due appellant in excess of the government's claim. This excess should, of course, be paid at once.

In the circumstances, however, the decision of the lower court refusing the writ is affirmed without prejudice to appellant to renew the motion as to any excess admittedly due it in excess of the claim of the government, if such excess is withheld.

No costs shall be chargeable against appellants on this appeal.

Affirmed.