In the Matter of ROBERT B. BLAIKIE, Petitioner. STATE HARNESS RACING COMMISSION, Respondent; ROOSEVELT RACEWAY, INC., et al., Intervenors-Respondents.

First Department, July 5, 1960.

*Charles B. McGroddy, Jr.,* for petitioner.

*Samuel I. Rosenman* of counsel (*George Morton Levy, Max Freund, Robert A. Kirtland* and *Ernest A. Gleit* with him on the brief; *Rosenman Goldmark Colin & Kaye,* and *George Morton Levy,* attorneys), for Roosevelt Raceway, Inc., intervenor-respondent.

*Louis J. Lefkowitz, Attorney-General,* for respondent.

*Frank A. Fritz* of counsel (*Arthur P. West* and *John F. Minicus* with him on the brief; *Bleakley, Platt, Walker, Hart & Fritz,* attorneys), for Yonkers Raceway, Inc.

BOTEIN, P. J. Section 9 of article I of the State Constitution, which prohibited gambling within the State, was amended in 1939 so as to provide for such "pari-mutuel betting on horse races as may be prescribed by the legislature and from which the state shall derive a reasonable revenue ". In 1940 the Legislature implemented the 1939 amendment by adopting the Pari-Mutuel Revenue Law (L. 1940, ch. 254), which among other things, legalized betting at tracks and created the State Harness Racing Commission to license and supervise harness race tracks.

The Pari-Mutuel Revenue Law specified, in essence, that out of the moneys wagered daily by bettors at harness race tracks, the tracks should pay 85 cents of each dollar in the betting pool to the winning bettors and withhold 15 cents. A graduated percentage of the 15 cents was to be paid to the State, as a tax

for the privilege of conducting such betting, and the remainder was to be retained by the track for its own uses and purposes.

The commission licensed the two intervenors in this application to conduct pari-mutuel betting — Roosevelt Raceway, Inc. in 1940 and Yonkers Raceway, Inc. in 1949. From those dates to the present time these intervenors and other similarly licensed tracks have been in operation and paid taxes to the State.

In 1956 the Legislature enacted section 45-a of the Pari-Mutuel Revenue Law (L. 1956, ch. 837, § 1), the statute under attack by the applicant, after finding that some harness race tracks had " become depreciated and inadequate for the proper conduct of harness horse race meetings "; and that as a consequence " the state has lost substantial revenue and income " and " that enlargement and modernization of plant and structures * * * would result in increased admissions " (subd. 1), which would, of course, mean larger tax payments to the State. Subdivision 7 authorizes the commission to issue permits to tracks to make capital improvements, upon its finding that such improvements, among other things, will " ultimately add to the revenues of the state ".

Subdivision 5 of the 1956 law provides for the establishment of a " construction account ", with the approval of the commission, from which the tracks would be reimbursed for the expenses of the capital improvements. The Legislature retained the basic statutory structure for the division of the 15% of the betting proceeds that was to be withheld and divided between the track and the State, with some upward revision of the taxes; but it added a formula for allocating part of the State's share of the 15% retention of the funds to be deposited in the construction account. This formula does not become operative until the State has received under the basic provisions for payment of the taxes an amount equal to the pari-mutuel tax received from the track in the year 1955, after certain adjustments have been made. In 1955 the State had received its greatest revenue from harness racing in the 15 years that sport had been authorized.

When the 1955 plateau of tax return has been reached from payments by all tracks (subd. 6), 50% of the revenue that the State would be entitled to receive from any one track over and above that amount is to be deposited in the construction account, which is to be maintained in the name of the track; and the other half is to be paid to the State as taxes. At the end of every calendar year, all moneys, if any, in the construction account not payable to the track for completed and approved

capital improvements are to be paid to the State as pari-mutuel taxes.

On June 5, 1956, the commission issued a capital improvement license and construction permit to the intervenor Roosevelt, conditioned upon the completion of the capital improvement described in the latter's application. Roosevelt has completed its capital improvement project, at a cost certified by the commission and running into many millions of dollars. Roosevelt has been reimbursed to date for only a part of this cost; and it is to the alleged illegality of the past payments and those contemplated for the future, that this application is directed.

It is a unique application, posing problems of first impression, and brought by a citizen and taxpayer named Blaikie. He seeks permission to institute and maintain an action, pursuant to the provisions of section 111 of the State Finance Law, against Roosevelt and the State Harness Racing Commission. He proposes in such an action to seek the following relief: (1) an order restraining Roosevelt from reimbursing itself (without the warrant of the Comptroller of the State of New York) from the afore-mentioned construction account; (2) a declaratory judgment adjudicating as unconstitutional in its entirety that portion of the Pari-Mutuel Revenue Law which authorizes harness racing tracks to reimburse themselves for capital improvements; (3) an adjudication that all sums previously received and paid by Roosevelt to itself and those funds still remaining in its construction account constitute moneys and property of the State of New York; and (4) permission to bring similar actions against other harness tracks in the State which have set up such construction accounts and reimbursed themselves therefrom without warrant of the Comptroller of the State of New York.

Blaikie claims the right to commence a taxpayer's action by virtue of section 1 of article V of the Constitution of the State of New York which reads in part as follows: "The payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void, and may be restrained upon the suit of any taxpayer with the consent of the supreme court in appellate division on notice to the attorney-general."

This amendment, adopted at the 1938 Constitutional Convention, was implemented a year later by section 111 of the State Finance Law, which provides: "No moneys of the state, including moneys collected in its behalf, and no moneys in the possession, custody or control of any officer, agent, or agency of the state in his or its representative capacity, and no moneys in or belonging to any fund or depositary, title to which is

vested in this state, shall hereafter be paid, expended or refunded except upon audit by the comptroller. The comptroller is hereby charged with the duty of compelling observance of and compliance with the provisions of this section but any violation of this section may be restrained upon the suit of any taxpayer with the consent of the supreme court in appellate division on notice to the attorney-general."

It is these moneys in the construction account that the applicant contends should not have been and should not henceforth be disbursed without audit by the Comptroller under section 111 and its constitutional progenitor. Before considering this aspect of the application, however, we shall address ourselves to Blaikie's contention that section 45-a of the Pari-Mutuel Revenue Law (the 1956 statute), is unconstitutional in its entirety.

The State constitutional provisions allegedly violated are (1) section 11 of article I which prohibits denial of equal protection of the laws; (2) section 8 of article VII which prohibits the gift or loan of State money or credit in aid of any private corporation, association or undertaking; (3) section 1 of article XVI which prohibits the surrender, suspension or contracting away of the power of taxation; and (4) section 22 of article III which provides that every law which imposes a tax shall distinctly state the tax and the object to which it is to be applied.

The constitutionality of the statute is not open to unconstrained attack by this applicant. The reason has been stated succinctly in *Doolittle* v. *Supervisors of Broome County* (18 N. Y. 155, 162). "Every person may legally question the constitutional validity of an act of the legislature which affects his private rights; but if a citizen may maintain an action for such a purpose in respect to his rights as a voter and tax-payer, the courts may regularly be called upon to revise all laws which may be passed." When the capacity of the plaintiff to sue has been challenged, the rule denying an individual taxpayer the right to test the constitutionality of legislation has been enunciated consistently, unless his property rights are specificially and particularly affected thereby. (See *Kilbourne* v. *St. John,* 59 N. Y. 21; *Schieffelin* v. *Komfort,* 212 N. Y. 520; *Bull* v. *Stichman,* 273 App. Div. 311.)

This rule has in no wise been relaxed by section 111 and section 1 of article V of the Constitution so as to furnish a taxpayer standing to contest the constitutionality of the 1956 law generally on the grounds asserted upon this application. At best, Blaikie would have standing, with the consent of this court, to challenge the constitutionality of section 45-a of the Pari-Mutuel Revenue Law if its provisions violated the auditing

requirements of the very constitutional section which gives him the right to make this application. Blaikie, however, does not claim that the 1956 law by its provisions violates section 1 of article V, but rather that the Comptroller and Roosevelt are violating the constitutional auditing mandate by the manner in which the construction account is being operated.

In a somewhat analogous application, in *Matter of Oneida County Forest Preserve Council* v. *Wehle* (309 N. Y. 152), a citizen applied to the Appellate Division, Fourth Department, for leave to bring a suit to restrain the Conservation Commission from letting out contracts for removal of trees pursuant to a law allegedly in violation of section 1 of article XIV of the Constitution. Section 4 of the same article XIV provided that a citizen, also with the consent of the Appellate Division, could bring suit to restrain the violation of any provision of that article. In other words, the applicant in the *Oneida* case alleged that the statute under attack violated the very constitutional provision which stated that in the event of such violation a citizen might sue to restrain it; and so it was held the applicant possessed the standing to bring the action.

The applicant in the *Oneida* case, however, did not limit his proposed relief to enjoining the violation of article XIV alone. He asked the Appellate Division for, and was granted, authorization to sue also for " such other legal remedy or remedies in the premises as they may be advised." In modifying as to this aspect of the relief granted, the Court of Appeals limited the consent to the institution of a suit to restrain only the violation of section 1 of article XIV of the Constitution.

Since, therefore, Blaikie has no standing to challenge the constitutionality of section 45-a generally, and does not challenge it specifically on constitutional grounds as violative of section 1 of article V, he may not sue to declare the statute unconstitutional. We turn to his second major contention — that the fund held by the track in its construction account may not be paid out without the Comptroller's audit.

To so hold we must first find that the money deposited in the construction account falls into one of the following categories: (1) that it is money of the State, (2) moneys collected on its behalf, or (3) moneys in the possession, custody or control of any officer, agent or agency of the State in his or its representative capacity.

We do not believe that the construction fund money constituted State money. There is no doubt that the Legislature strove and intended to remove any basis for stamping the funds in the construction accounts as State moneys. On March 9,

1956, while the bill was before the Legislature, the Attorney-General commented in a letter on the fact that those provisions in a prior bill had been eliminated "which establish a construction fund in the custody of the State Harness Racing Commission, from which the tracks would be reimbursed for the expenses of certain improvements." Approving the change to the present provision, which places the construction account in the name of the track, the Attorney-General said: "This change, in my opinion, eliminates the constitutional doubts respecting the use of State funds for private purposes, which I expressed in my previous memorandum."

Thus alerted, and probably to dispel any doubt as to its intent, the Legislature provided in subdivision 8 of section 45-a that moneys in the construction account "shall be held by the harness race track not as public moneys but solely for the purpose of making the distribution as provided in this section."

The question, of course, is whether the Legislature effectuated what it expressed and clearly intended. It may not change the countenance of State moneys by a statutory declaration that they are not State moneys, if in law and fact they are; but its declaration, while not conclusive, is influential.

The sums deposited in the construction account originate from moneys wagered by bettors, which are deposited in the track's name in a special account. Upon completion of a capital improvement to the satisfaction of the commission, the track will be reimbursed for the cost of such improvement. It may be noted that the commission has certified to the cost of the Roosevelt capital improvement in a sum far greater than the amounts thus far paid to that track out of its construction account. In short, the State never has title to the funds while they are in the construction account. It cannot withdraw any of the funds in the account, in the same fashion that the conventional depositor can draw upon his bank account. The language of the court in *United States* v. *Maryland Jockey Club* (210 F. 2d 367, 370, cert. denied 347 U. S. 1014) is quite appropriate in this situation: "In our case, the sum involved was received by taxpayer through the operations of its pari-mutuel betting at its race track. It was allowed to collect the sum, but was required to deposit it in a State Racing Fund to be held for a three year period during which the State could not acquire absolute title, use or enjoyment of the fund. If the fund was needed for permanent capital improvements it could, with the permission of the Racing Commission, be drawn upon by taxpayer. If not drawn within three years it became the property of the State. Until that time the State never acquired absolute

title to the Racing Fund involved. It was a fund created and set aside for use of the taxpayer if the need arose, and could not be used by the Racing Commission for any other purpose. The Racing Commission did not collect the sums as a tax. It was not a taxing agency but a regulatory body. Thus, where the fund never vested absolutely in the State as is clearly the fact here, it was never the State's fund for subsidies but represented the taxpayer's own receipts from its own operations, of which it was temporarily deprived of enjoyment but as to which it later realized enjoyment to the extent that the fund was utilized." (See, also, *Richmond Fredericksburg & Potomac R. R. Co.* v. *McCarl* (62 F. 2d 203, cert. denied 288 U. S. 615.)

Only when the track has recovered its capital improvement expenditures may the State lay claim to any moneys remaining in the construction account; and in such a contingency it has the status of a creditor. It is clear, therefore, that the funds in the construction account are not moneys of the State.

Nor do we agree that the fund constitutes money collected on behalf of the State. An attempt to characterize a track as an agent of the State was rejected in *Madden* v. *Queens County Jockey Club* (296 N. Y. 249, 254, cert. denied 332 U. S. 761), where the court said: "It should be noted that the tax is thus imposed not on the bettor for the privilege of *betting* — analogous to the imposition of a sales tax upon the purchaser from a retail store — but upon the licensee for the privilege of *conducting* pari-mutuel betting. Adopting plaintiff's position, it would be equally valid to argue that every licensee, theatre manager, cab driver, barber, liquor dealer, dog owner — to mention a few — must be regarded as 'an administrative agency of the state' in the conduct of his every-day business simply because he pays a tax or fee for his license."

In *Fox* v. *Mohawk & Hudson Riv. Humane Soc.* (165 N. Y. 517), relied on by the applicant, the court had before it a statute authorizing the defendant to collect a dog license tax and apply the proceeds to its own corporate purposes. This case is distinguishable, since the 15% of the moneys wagered by bettors retained by the track are not taken from these bettors in the form of a tax or a license fee. (See *People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367; cf. *American Soc. for Prevention of Cruelty to Animals* v. *City of New York,* 205 App. Div. 335.)

There remains the third prong of the applicant's contention that the moneys in the construction account may not be expended except upon audit by the Comptroller — his argument that these are moneys in the possession, custody or control of an agency of the State.

The term "possession, custody or control" connotes the power to dispose of the funds in question. The commission, as previously indicated, has no power to invest, withdraw or dispose of any funds in the construction account. It has no more than supervisory authority to take precautions to the end that Roosevelt will transfer construction account funds to its general funds only when it is entitled to reimburse itself for the cost of capital improvements. There can be a vast difference between the State's supervision of a company and its control of that company's funds. For example, banks and insurance companies are closely supervised by the State Superintendents of Banks and of Insurance, respectively. Yet the reserve and deposits of these supervised banks and insurance companies cannot by any language incantations be transmuted into moneys under the control of the State. As a practical matter, the commission under its statutory powers could hamper but hardly prevent the track from prematurely withdrawing any of the construction funds, in which event the commission would be relegated to the role of creditor.

In reality, the statute scarcely invests the commission with any more power over the construction account than the power it could have exercised prior to 1956 over the 15% of the betting pool that is retained by the track; and it cannot be contended that such initial 15% retained amount is under the control of the State. A number of supervisory safeguards were inserted in the 1940 statute and still obtain in order to ensure that the State will receive its rightful taxes from the tracks, such as requirements for regular reports under oath from the tracks to the commission, the furnishing of bond to secure faithful performance of the tracks' duty to keep records and pay taxes, access by the State Tax Commission at all times to the tracks' books and records, the power to prescribe forms and systems of accounting to be employed by the tracks and others. The only additional precaution found in the 1956 law that is applicable only to the construction account is a provision that it be opened as a special account by the track " in its own name " (subd. 5, par. [a]), in a bank of the track's own selection.

In essence, the 1956 law offers the tracks a formula under which the taxes otherwise payable to the State will be reduced, provided they exceed the 1955 tax plateau and the tax savings are channeled into capital improvements. No one would gainsay the power of the Legislature to revise the tax schedule and to provide such reductions outright, without any strictures concerning capital improvements.

It is evident that the construction account funds are not moneys in the possession, custody or control of the State, nor moneys of the State nor moneys collected on its behalf. Therefore, there is no requirement, under section 1 of article V of the Constitution, or section 111 of the State Finance Law, that these funds be audited by the Comptroller.

In passing upon Blaikie's application for leave to bring a taxpayer's action we are advisedly deciding the merits of the contemplated action itself. We do this because we gathered during argument that counsel for all concerned with the application are agreed that there has been submitted upon this application substantially all of the evidence that could be presented upon a trial of the proposed action, and that there will be no controverted issues of fact.

Accordingly, the application of petitioner should be denied, without costs.

STEVENS, J. (concurring in result). This application for leave to institute suit to enjoin payment of certain moneys is grounded upon the provisions of section 1 of article V of the New York Constitution and section 111 of the State Finance Law. These sections prohibit the payment of State moneys or moneys in the custody or under the control of the State without audit by the Comptroller. If the prohibition is not observed, upon application and notice to the Attorney-General, the Appellate Division may authorize a taxpayer to institute suit to enjoin the violation.

The language of the statute is contemplative; it envisages a restraint on further or future action. Precedent to granting leave there must be at least a finding or determination that the funds, prima facie, are within the categories specified. The extent of the power vested in the taxpayer, if leave be granted, is by court action to enjoin or prevent *further* payment. There is neither constitutional nor statutory right in the individual to demand recovery of moneys already paid out.

The decision in the companion case (*Matter of Roosevelt Raceway* v. *Monaghan,* 11 A D 2d 206) is being handed down herewith. Since the law in this case as declared by the majority is that these are not public funds (a conclusion with which I do not agree), a dissent would be an idle gesture. Moreover, if leave were granted, and the efforts of the applicant were crowned with success, audit would be required only as a condition precedent to payment. That is, of course, if the objective were lawful and proper. Roosevelt Raceway, Inc., without conceding these are public funds, has expressed a willingness and consent to audit. I concur, therefore, only in the result, not in

the holding of the majority that the funds in the construction account are not State funds.

BOTEIN, P. J., RABIN, VALENTE, McNALLY and STEVENS, JJ., concur in denial of application; RABIN, J., concurs in opinion by BOTEIN, P. J.; VALENTE and STEVENS, JJ., concur in result in opinion by STEVENS, J.; McNALLY, J., concurs in result only.

Application pursuant to section 111 of the Finance Law for permission to commence and maintain a taxpayer's action for an injunction against Roosevelt Raceway, Inc., and any other harness racing tracks which may have diverted certain revenues of the State of New York, and the State Harness Racing Commission, denied without costs.