In the Matter of ROOSEVELT RACEWAY, INC., Respondent, against GEORGE P. MONAGHAN, as Commissioner of Harness Racing, Appellant.

First Department, July 5, 1960.

*Paxton Blair* of counsel (*Edward Siegfried* with him on the brief; *Louis J. Lefkowitz, Attorney-General,* attorney), for appellant.

*Samuel I. Rosenman* of counsel (*George Morton Levy, Max Freund, Robert A. Kirtland* and *Ernest A. Gleit* with him on the brief; *Rosenman Goldmark Colin & Kaye* and *George Morton Levy,* attorneys), for respondent.

*Samuel D. Smoleff* of counsel (*Earle K. Moore* with him on the brief; *Samuel D. Smoleff,* attorney), for Citizens Union, *amicus curiæ.*

*Per Curiam.* The Harness Racing Commission has appealed from an order at Special Term, in a proceeding pursuant to article 78 of the Civil Practice Act brought by petitioner Roosevelt Raceway, Inc., directing that petitioner's construction account be credited with Federal income taxes paid or hereafter to be paid, and requiring the commission to correct its records accordingly. The underlying facts and relevant statutory and constitutional provisions have been set forth in Presiding Justice BOTEIN's opinion in *Matter of Blaikie* v. *State Harness Racing Comm.* (11 A D 2d 196), decided simultaneously herewith, and which it is intended should be read in conjunction with this opinion.

The Attorney-General raises questions for the first time, in the form and scope they are presented upon this appeal, as to the constitutionality of section 45-a of the Pari-Mutuel Revenue Law (L. 1956, ch. 837), if that law is construed as the petitioner contends it should be. The Attorney-General argues that the uses to which petitioner seeks to put the construction account funds would be violative of section 7 and 8 of article VII of the State Constitution, which provide:

" § 7. No money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years next after the passage of such appropriation act; and every such law making a new appropriation or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object or purpose to which it is to be applied; and it shall not be sufficient for such law to refer to any other law to fix such sum."

" § 8. The money of the state shall not be given or loaned to or in aid of any private corporation or association, or private

undertaking; nor shall the credit of the state be given or loaned to or in aid of any individual, or public or private corporation or association, or private undertaking, but the foregoing provisions shall not apply to any fund or property now held or which may hereafter be held by the state for educational purposes.''

It should be noted that not only is this constitutional question raised for the first time on this appeal, but it is the only constitutional provision that appellant claims has been violated.

In Presiding Justice BOTEIN's opinion in *Matter of Blaikie,* referred to above, it was concluded that the funds in the construction account are not '' money of the State '' nor '' money under its control '', and we adopt that conclusion and the reasons underlying it for all purposes in this opinion. The Attorney-General, in his brief, equates funds under the State's management, as provided in the afore-mentioned section 7 of article VII of the Constitution, with funds under its control, and we are in agreement. Since the moneys which are the subject matter of this proceeding are not in the State treasury, nor State funds, nor under its management, they do not come within the interdiction of the constitutional provisions relied upon by the State; and so this argument must fall at the very threshold of our consideration. (See additionally, *People ex rel. Evans* v. *Chapin,* 101 N. Y. 682; *Matter of Clark* v. *Sheldon,* 106 N. Y. 104.)

Nor is title to these funds in '' a state of suspension '', as stated in the dissenting opinion of Mr. Justice VALENTE. Title is always in the track, just as securely as the track has title to the State's original share of the betting pool until such time as it actually makes payment to the State. These payments are to be made, the statute provides, at such regular intervals as the commission may require, and '' when collected '', paid by the commission into the State treasury.

As to the other points raised by appellant, the 1956 law provides in clear and unmistakable language that a so-called capital improvement track is entitled to receive from its construction account a sum of money, net after Federal income taxes paid thereon, equal to the cost of the improvements approved by the commission; and Special Term therefore construed the 1956 law correctly in that regard. Furthermore, the legislative intent with respect to the 1956 law was so clear that the 1959 law was not a clarification but was in effect an amendment of the earlier statute, and therefore not binding in a judicial proceeding affecting the earlier statute (*City of New York* v. *Village of Lawrence,* 250 N. Y. 429, 447; *People*

*ex rel. Mutual Life Ins Co.* v. *Board of Supervisors,* 16 N. Y. 424, 431, 432).

Accordingly, the order appealed from should be affirmed, without costs.

STEVENS, J. (dissenting). Petitioner-respondent, herein called petitioner, instituted an article 78 proceeding to compel respondent-appellant State Harness Racing Commission, hereinafter called respondent, to recognize that it is entitled to be reimbursed out of a construction account provided by statute for certain income tax payments made by it to the Federal Government.

This appeal is from an order directing that the construction account be credited with (1) $1,404,664.63, the amount of the income tax paid to the Federal Government on the sum of $2,858,495.38 previously transferred to the petitioner's general funds under section 45-a of the Pari-Mutuel Revenue Law (added by L. 1956, ch. 837) and (2) directing future similar Federal income tax payments.

There are certain constitutional provisions to which attention is directed at the outset.

Every law which imposes or continues a tax " shall distinctly state the tax and the object to which it is to be applied ". (N. Y. Const., art. III, § 22.) Funds of the State or funds under the management of the State can only be paid by legislative appropriation. The sum appropriated, its object and purpose must be specified (N. Y. Const., art. VII, § 7). All moneys of the State, or moneys under its control can only be paid upon audit by the Comptroller (N. Y. Const., art. V, § 1). Neither the money nor credit of the State may be given or loaned to or in aid of any private corporation or association (art. VII, § 8). And the power of taxation can never be surrendered, suspended or contracted away except for securities issued for public purposes pursuant to law (art. XVI, § 1).

If any one of these constitutional provisions is violated then respondent should prevail. As a matter of fact, in this case everyone is violated.

There is no question but that in the statute adopted the Legislature sought to avoid any violation of these constitutional principles (see Opinion of Attorney-General dated March 9, 1956). The question is whether such avoidance was successful, and the answer should be that it was not.

Section 9 of article I of the State Constitution empowered the Legislature to permit pari-mutuel betting on horse races conditioned upon the State deriving a reasonable revenue from the operation. Except as the constitutional provision permits, the activity is illegal.

Pursuant to the power conferred the Legislature enacted section 2 of chapter 254 of the Laws of 1940 declaring pari-mutuel betting to be lawful if conducted in the manner and subject to the conditions and supervision provided by the act, it being the purpose of the act to derive a reasonable revenue therefrom for the support of government, to promote agriculture and the improvement of horse breeding.

The State Tax Commission was charged with the financial administration of pari-mutuel betting, and with the authority to prescribe the forms and system of accounting to be employed, while the State Harness Racing Commission was given general supervision and control of pari-mutuel betting with the power to make rules regulating the conduct of such betting.

It is notable that when pari-mutuel betting was legalized it was provided that the act should be known as the Pari-Mutuel *Revenue* Law. In section 45 thereof, " [d]isposition of pari-mutuel pools ", it was stated at the outset that the association " shall distribute all sums deposited in any pari-mutuel pool to the winners thereof less fifteen per centum of the total deposits plus the breaks." Then followed language detailing the State's and the track's percentages of the breaks and of the total pool " which tax ", as to the State's interest, " is hereby levied." The bond required of the association had as its stated purpose assurance that tax moneys would be paid and moneys properly distributed to patrons of the pari-mutuel pools who were holders of winning tickets (§ 43) (see *Aliano* v. *Westchester Racing Assn.*, 265 App. Div. 225). The act thus expressed clearly the dual objectives of the Pari-Mutuel Revenue Law, (1) the protection of the patron and (2) the collection of reasonable revenue from the operation of pari-mutuel betting.

Refunds for and moneys unpaid on pari-mutuel tickets are directed to be held until April 1 of the following year, then paid into the general funds of the State treasury (§ 53). This was true in the law as originally written and as amended. The most recent amendments provide for the addition of interest and penalties if the moneys are not turned over within the required time.

The various amendments to section 45, (disposition of pari-mutuel pools), prior to 1956, increased the percentage of the State's take from the pools but left unchanged the bettors' 85% interest. This evinced the legislative intent to adhere to the basic purposes of the law, viz., protection of the public and the collection of reasonable revenue, within the powers granted by the Constitution.

In 1956 the Legislature amended chapter 254 of the Laws of 1940 by adding a new section, known as section 45-a (L. 1956, ch. 837). This amended the pari-mutuel law " in relation to capital improvements to harness race tracks ", etc. This added a third purpose to the Pari-Mutuel Revenue Law, the object being to provide for or make possible capital improvements to a private enterprise. The amendment began with a statement of policy and purpose, a finding that the physical plant and structures of the harness tracks were depreciated and inadequate; admissions to the tracks and deposits in the pari-mutuel pools were limited (though in point of fact revenues had been increasing steadily); that the State had lost substantial revenues which it would have had if more people attended and placed bets, and concluded that in order to remedy the situation, " and facilitate the enlargement and modernization of plant and structures " which would redound to the financial benefit of the State and safety and comfort of the public, section 45-a was enacted.

Section 45-a had many distinctive features. It declared section 45 no longer applies to any existing track (subd. 3). The percentages of moneys required to be collected were brought over bodily into section 45-a, with a limitation that sums payable to the State be continued as before until the level of the base year (1955) was reached (subd. 4). After the tax paid reaches the level of the base year, the track is required in that calendar year for moneys collected above such level to " open a special account in its own name followed by the words ' construction account ' in a bank subject to the jurisdiction of this state and * * * shall deposit therein, out of the sums retained from any pari-mutuel pool, one-half of the amount determined by the same percentages of such pool set forth in subdivision four of this section which it had theretofore in such year paid to the state tax commission and it shall pay the other half of said amount so determined to such commission " (subd. 5[a]). It is this money (formerly moneys accruing to the State as tax moneys), which is to be used to pay for the capital improvements approved by the State Harness Racing Commission upon completion thereof (subd. 6) by the transfer of such funds from the construction account to the general funds of the track.

It is also from the funds of the construction account in addition to reimbursement for capital expenditures, that reimbursement for Federal income taxes paid by the track on such reimbursement shall be made. " In determining the amount of the taxes paid by any such harness race track to the United

States in any calendar year it shall be deemed that said amounts were taxed at the highest rates actually paid to the United States by such harness race track for the particular year involved.'' (Subd. 10.)

The language of subdivisions (4) and (5) points up four things. (1) The percentage paid to the bettor is not affected. It remains 85%. (2) The percentage paid to the track prior to the passage of the 1956 law remains the same. (3) The funds in the construction account are made up solely and exclusively of moneys theretofore accruing to the State and, in effect, levied as taxes. (4) The moneys so collected were, in effect, levied and collected by virtue of the taxing power of the State and in the percentages it prescribed.

Section 45-a re-emphasizes what was clear in the law prior to its passage in 1956, i.e., that pari-mutuel betting is precisely regulated by the statute. '' Its object seems to be to discourage gambling among persons most likely to be injured by it '' (*Matter of Stewart* v. *Department of State,* 174 Misc. 902, 905, affd. 260 App. Div. 979, motion for leave to appeal to Court of Appeals denied 261 App. Div. 851).

But the primary purpose of the Pari-Mutuel Revenue Law is not to legalize betting but to raise revenue for the State. The '' [b]enefit to the racing association is merely incidental to collection of a tax by the State which, pursuant to its declared purpose in enacting the statute, benefits most.'' (*Aliano* v. *Westchester Racing Assn.,* 265 App. Div. 225, 230.) '' The Racing Association is the law's administrative agent for collecting and distributing the pool.'' (*Holberg* v. *Westchester Racing Assn.,* 184 Misc. 581, 584; *Aliano* v. *Westchester Racing Assn., supra,* p. 228.) And the State Racing Commission is a governmental administrative body. (*Matter of Fink* v. *Cole,* 302 N. Y. 216.)

Subdivision 8 of section 45-a declares that the moneys in the construction account are not public moneys. The Legislature has wide discretion to determine what are public moneys, as well as to determine what is a public purpose. Similarly it can declare what moneys are or are not in the control of the State. It is generally the exclusive judge of the propriety of the expenditure. The court however may scrutinize the purpose to determine if it is in fact as declared to be. But the judicial inquiry must be confined to the face of the bill itself and to things that are the subject of judicial notice. (*Waterloo Woolen Mfg. Co.* v. *Shanahan,* 128 N. Y. 345.) In this determination the language and general scope of the act is considered. (See *Weismer* v. *Village of Douglas,* 64 N. Y. 91.)

Generally, the test of constitutionality of a statute requiring the use of public funds is whether the statute is designed to promote the public interest and welfare as opposed to individual or private advantage. Whether or not the use is a public use is a judicial question. (*Matter of Deansville Cemetery Assn.*, 66 N. Y. 569—Legislation conferring upon rural cemetery association the right of eminent domain, held unconstitutional.)

It is essential to our purpose to have a working definition of what constitutes public moneys, and to recognize what may serve as the indicia of control or management.

"Public funds * * * represent moneys raised by the operation of law for the support of government or for the discharge of its obligations. In other words, they constitute 'revenue' which, in turn, is defined as 'the income of government arising from taxation, duties and the like.'" (42 Am. Jur., Public Funds, § 2.) Generally, it may be said that they are funds raised by a governmental agency or unit by taxation, for the conduct or support of government and for a governmental purpose. (See, discussion in *People ex rel. Eisman* v. *Ronner*, 185 N. Y. 285; *Richmond, Fredericksburg & Potomac R. R. Co.* v. *McCarl*, 62 F. 2d 203, cert. denied 288 U. S. 615; *American Soc. for Prevention of Cruelty to Animals* v. *City of New York*, 205 App. Div. 335 [holding that fines or penalties collected were not public moneys]; *Fox* v. *Mohawk & Hudson Riv. Humane Soc.*, 165 N. Y. 517, 523 [license fees are public moneys].)

Management, custody or control are not dependent upon title. They may exist independently of it. Broadly speaking, each involves the right and power to say what shall be done with the moneys, where they shall be placed, how and in what manner and for what purpose they shall be disbursed. (Cf. *Board of Supervisors of County of Seneca* v. *Allen*, 99 N. Y. 532, 538.)

The act in question provides for the creation and declares the source from which the funds shall be collected. It requires that the depositary be one of a particular class, "a bank subject to the jurisdiction of this state" (subd. 5, par. [a]). The State Harness Racing Commission is empowered to require reports under oath as to the deposits in such account (subd. 5, par. [b]).

If the moneys paid by the tracks to the State in a calendar year do not equal the amount paid in the base year, each track is assessed proportionately to make up the deficit and such sums are to be paid out of the construction account. Or if the moneys in the construction account are not exhausted by

reimbursement for capital improvements or payments in accordance with subdivision 10, all sums remaining in the account are to be paid to the State Tax Commission (subd. 6, par. [a]). Moreover, such funds by State law are earmarked for a particular purpose, and the waiver of immediate payment of such funds to the State is conditioned upon the use for such purpose.

The tracks are not reimbursed for capital improvements until it is clear there will be no deficit assessment. Assurance that such funds will not be dissipated is contained in the language which conditions capital improvements upon approval of the harness commission, payment upon completion of such improvement, with reports submitted at regular intervals to the commission as to the condition of the account or other information required by it. The Harness Racing Commission has broad powers to effect the purposes of the Pari-Mutuel Revenue Law and to prevent circumvention or evasion thereof (§ 36). In effect the construction account is under the management of the commission, and the State's claim to these moneys is suspended conditionally, but never abrogated entirely. If that condition be not met, or if met, and an excess remains, such moneys are required to be paid to the State.

One of the indicia of the ownership of private property by an individual or corporation is the right to use its money or assets as it wills within the law, subject only to the rights of others. No track contends seriously that it has a right of control and absolute disposition over these funds, independent of affirmative action by the Harness Racing Commission approving reimbursement for capital improvements made in accordance with the statute.

The essential character of the funds in the construction account is not determined or governed by the disclaimer that these are not public moneys, nor by any other label ascribed to them. The courts are bound to look beyond the verbal description to determine, in reality, the source and nature of the tax (cf. *People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367, tax collected under general State excise law. Held, not public moneys within meaning of section 20 of article III of the Constitution) as well as the extent of control exercised over the funds.

Section 45-a by its language forbids a diversion or appropriation of these moneys unless their counterpart is first spent by the tracks for capital construction. This prohibition rests on the initial levy of these funds as taxes and the restriction in the tax statute on its disposition. It depends, therefore, on the manner in which they were accumulated. Hence, they con-

stitute prospective tax revenues which the State will claim if the condition subsequent of approved capital expenditure is not met.

Applying the analysis to this case, the right to reimbursement of the Federal income tax depends upon the moneys in the construction account which are raised by virtue of the State's taxing power, the disbursement of which is subject to unilateral future action of the track in its decision whether to construct or not.

This is not a tax abatement for tax abatement is prospective. Abatement of a property tax relieves such property of its share of the tax burden after assessment and levying of the tax. Abatement of an individual tax is a reduction or decrease in the amount of tax imposed on such person. This is money controlled by the State only because it is accumulated as a tax levy. It is not a prospective abatement of a tax levy.

Since this is prospective tax revenue and the Legislature merely provided for postponement of payment to avoid having such moneys labeled tax moneys, the money is held for the benefit of the State subject to defeasement of interest by occurrence of a condition subsequent. While the device is used of having the track expend counterpart moneys, and then apply to the State commission for reimbursement of moneys it has borrowed and spent, in fact the State's conditionally levied funds have been pledged as a guarantee of payment. Nor can it be disputed that payment is made from funds under the State's management without appropriation (N. Y. Const., art. VII, § 7). The tight provisions for deposit, disbursement and approval by the Harness Racing Commission establish that management or control. Equally objectionable, therefore, constitutionally, is the fact that funds subject to the control of the State through its duly created agency, are being paid without audit by the Comptroller (N. Y. Const., art. V).

If it be argued that the State has not in fact imposed a tax by which the funds in the construction account were created, but merely authorized the track to collect funds which may ripen into a tax levy, subject to defeasance at the hand of the race track, attention is directed to section 1 of article XVI of the Constitution. '' The power of taxation shall never be surrendered, suspended or contracted away, except as to securities issued for public purposes pursuant to law. * * * Exemptions from taxation may be granted only by general laws.'' Hence the race track has in its power to decide how much of the conditionally collected taxes shall remain taxes and how much it shall spend for itself.

Except for appropriations contained in bills submitted by the Governor and in a supplemental appropriation bill submitted for the support of government " no appropriations shall be made except by separate bills each for a single object or purpose" (N. Y. Const., art. VII, § 6). Money may not be paid out of State funds or funds under its management without appropriation by law, which law is required to distinctly specify the sum appropriated, and the object and purpose to which it is to be applied.

Section 45-a in establishing the construction account does not specify any sum. It merely deals in percentages. The amount of Federal income tax to be reimbursed is neither certain nor specific. Under the language of subdivision 10, there is an obligation to reimburse for the income tax paid, calculated at the highest level. In operative effect such reimbursement need not cover liability created solely as a result of reimbursement of funds from the construction account. The period for which the liability is to continue is uncertain. The State at no time acquires any interest in or title to the capital improvements. While the State is reimbursing for Federal income taxes paid, the track may claim depreciation on such improvements as a tax deduction. Again, these moneys so paid out are not itemized but merely lumped under a general title in violation of article VII, and there is no veto power as to payment in the executive (art. IV, § 7) but only in the Harness Racing Commission.

Attention was directed to the requirement of section 1 of article V of the New York Constitution, that money of the State or money under its control, as well as refunds to the State, are required to be audited by the Comptroller who is an official independently elected. If not so audited such payments are void. Under this legislation the account is not subject to audit by the Comptroller, and there is in fact no audit independent of such as might be done by the harness commission. Thus we have a situation where the beneficiary of the account and the commission, which of necessity function in close fraternity, alone decide what moneys shall be paid.

Section 8 of article VIII forbids State moneys or the credit of the State to be given or used in aid of any private corporation. This provision is designed to prevent the use of the State's money or credit in fostering private enterprise and business. The petitioner is a private business (cf. *Madden* v. *Queens County Jockey Club,* 296 N. Y. 249) and it is evident on the foregoing analysis that prospective tax revenues are pledged to supply capital improvements. The fact that the

revenues are prospective rather than current does not conceal the indirect pledge for the payment of the obligations of the private corporation.

The Legislature admittedly attempted to avoid the constitutional prohibitions by eliminating the requirement that the fund should be in the custody of the State Harness Racing Commission from which the tracks would be reimbursed for improvements. It did this by providing that the tracks should maintain these accounts in their own name (see Opinion of Attorney-General, March 9, 1956) but it was not willing to yield all claim or power to these funds. It so hedged the funds with restrictions and controls that the major difference is in the title of the account, and a vain declaration that these are not public moneys. The attempt is not, therefore, successful.

Public moneys or moneys derived from the ordinary power of taxation cannot be diverted to private purposes. They may be used only for a public purpose, the promotion of the public welfare or in recognition of a moral obligation. (See *People* v. *Westchester County Nat. Bank*, 231 N. Y. 465.)

Reimbursement to a private corporation for payment of its Federal income taxes is not a public purpose or in recognition of a public service. (Cf. *American Soc. for Prevention of Cruelty to Animals* v. *City of New York*, 205 App. Div. 335; *People* v. *Westchester County Nat. Bank, supra.*) The " moral obligation " referred to should spring from some " direct benefit was received by the state as a state or some direct injury suffered by the claimant under circumstances where in fairness the state might be asked to respond — where something more than a mere gratuity was involved." (*People* v. *Westchester County Nat. Bank, supra,* p. 477.) The payment of Federal income taxes is of direct benefit to the private corporation, and does not render any direct benefit to the whole People of the State. The nature of the enterprise in which the corporation is engaged precludes any such conclusion.

Prior to passage of the 1956 amendment (§ 45-a) the moneys above the 85% returned to the bettor were divided in stated percentages between the State and the tracks. The tracks' percentage represented compensation for general services, furnishing of supplies and equipment for, and supervision of pari-mutuel betting. The State's percentage was the reasonable revenue derived for support of government by means of the tax levied.

Subsequent to the passage of the amendment the percentage paid to the bettor and to the track remained unchanged. Only the moneys percentage-wise, theretofore paid to the State as

a result of the tax levied, suffered a change. This was accomplished by a diversion of one half of the moneys collected above the return for the base year of 1955. Though the same percentages continued to be collected, these moneys were placed in a construction account. To accept the premise that reimbursement of Federal income taxes may be made from this fund because they are not public moneys is a concept which does violence to our thinking. It is clear that these moneys were raised by an exercise of the taxing power.

If reimbursement under these circumstances be permitted, it is difficult to see why similar amusement enterprises should not enjoy similar tax benefits. There is nothing in the pari-mutuel law to warrant the exception or furnish grounds for the exclusion.

Even if one be disposed to quarrel with the conclusion that these are public funds and so subject to audit before disbursement (N. Y. Const. art. V), such a finding is not the only condition precedent to audit before payment. Where funds are in the custody, control or under the management of the State, audit by the Comptroller is required.

Looking to the statute, the State through its administrative agency restricts the selection of the depositary to one of a specified class. It prescribes the title for and nature of the account. Regular reports as to the amounts in, and condition of the funds are required, together with such other information as may be requested. The moneys in the account are restricted and may be used only for a specific purpose. A single fact standing alone may not be persuasive. But taken together, as they must be, they lead irresistibly to the conclusion that moneys in the construction account are under the control or management of the State through its duly appointed agent, the commission. To permit their disbursement without audit violates the Constitution.

The imposition of a variable tax by percentages, and the segregation of a portion of the proceeds in a fund from which reimbursement of Federal income taxes is to be made, is an attempted circumvention of the constitutional prohibitions referred to earlier. Direct imposition of taxes upon the public to pay the Federal income taxes of a private corporation would be violative of the Fourteenth Amendment of the Constitution of the United States.* General tax laws have for their primary

---

* It might be noted that the Legislature evidently entertained grave doubts about the constitutionality of this provision for Federal income tax reimbursement, for in 1959, in Special Session, it enacted a law wiping out this provision. (L. 1959, ch. 881.) That law cannot affect our disposition here.

purpose the support of Government and are justified upon the theory or principle of the protection afforded by the Government to the taxpayer. These are not excise moneys (*People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367, *supra*) but moneys raised under a statute to derive revenue for the support of Government. To tax directly for Federal income tax reimbursement of a private corporation would be to subject persons to an arbitrary exercise of the power of Government. Equally objectionable is a tax, however labeled, having the same objective, permitting such reimbursement through the guise of a construction account.

*United States* v. *Maryland Jockey Club* (210 F. 2d 367, cert. denied 347 U. S. 1014) did not pass upon the constitutional validity of such a provision as we have here. That was an action to recover a tax paid on a refund which the taxpayer claimed was erroneously made. Taxpayer paid the sum of $28,731.29 on an item of $75,608.66, which the Maryland Racing Commission refunded to the taxpayer from a fund similar in nature to the construction account. The court merely held that such refund was taxable income on which taxpayer must pay tax. There was no State challenge to the constitutionality of the racing fund, nor was the taxpayer seeking reimbursement from the fund or the State for Federal income taxes paid on the sum received. Moreover, the tax of one half of one percent was a required deduction from the gross and did not represent, apparently, a division of what theretofore had been moneys paid to the State. The court pointed out " Federal income taxes are based on reality not form, on fact not fancy, on substance not seeming " (p. 371). Such language if applied here leads to the conclusion that the device used should not be sanctioned, that there is no valid right or obligation to reimburse for payment of Federal income taxes.

I therefore dissent, vote to reverse and dismiss the petition.

VALENTE, J. (dissenting). I concur in the dissenting opinion of Mr. Justice STEVENS and agree that the provision in the Pari-Mutuel Revenue Law for the establishment of a so-called construction account is unconstitutional. In so doing, I recognize that the Legislature very properly might have, after the 1955 total base tax was collected, allotted part of the pool — made up from the 15 cents deducted from every dollar wagered — for track improvements and divided the remainder between the Tax Commission and the track in any proportion it wished.

However, it did not adopt this procedure.

Obviously, the provisions they did enact concerning this account were designed deliberately to leave title to the funds

in a state of suspension until December 31 of each year in order to avoid constitutional invalidity. But, the applicability of the constitutional limitations regarding the use of State funds must be determined on the basis of the property interests of the State and the track at the moment of allocation. Here allocation occurred when a deposit account was opened under subdivision 5 of section 45-a representing the proceeds of one half of the percentage the State was receiving as tax money under subdivision 4 of that section. At that instant there was a vesting of a property interest in the State, although subject to a divestiture. The inherent nature of the funds govern rather than the ex post facto determination at the end of the calendar year predicated on what the track may or may not have done by way of construction or the contingency of collection of the 1955 total base tax. But once the funds vested in the State — as they did here when the allocations were made — all provisions for limiting or defeating the interest of the State in those funds had to conform to constitutional standards. For example, there could not validly be an invasion of the State's title without audit by the Comptroller.

Reservation of control and management of the funds by the Racing Commission was not a valid substitute for the controls demanded by the Constitution. In fact, that reservation accentuates the State's vested interest in the funds. Where the Constitution directly prohibits certain action, the mandate should not be permitted to be circumvented by indirection. Since that was the evident purpose of the provisions under review, they must be struck down no matter how ingenious the subterfuge may be.

BOTEIN, P. J., RABIN and NOONAN, JJ., concur in Per Curiam opinion; STEVENS, J., dissents and votes to reverse and dismiss in opinion; VALENTE, J., concurs with STEVENS, J., in a separate opinion.

Order appealed from affirmed, without costs.