HOWARD UNIVERSITY, Appellant,

v.

Philip C. BATEN, Appellee.

Philip C. BATEN, Appellant,

v.

HOWARD UNIVERSITY, Appellee.

Nos. 91–CV–1016, 92–CV–116.

District of Columbia Court of Appeals.

Argued June 2, 1993.
Decided Oct. 14, 1993.

Susan L. Riley, Washington, DC, for appellant in No. 91–CV–1016 and appellee in No. 92–CV–116.

Lawrence E. Williams, Jr., Washington, DC, for appellant in No. 92–CV–116 and appellee in No. 91–CV–1016. Philip C. Baten also submitted a brief pro se.

Before STEADMAN, FARRELL, and WAGNER, Associate Judges.

FARRELL, Associate Judge:

Philip C. Baten sued Howard University for firing him without just cause, in alleged breach of their employment contract.[1] A jury found for Baten and awarded him $286,333 in damages. Howard appeals, arguing (1) that its motion for judgment notwithstanding the verdict should have been granted, and (2) that the jury was improperly permitted to award Baten damages for mental anguish arising from the breach of contract. We hold that the evidence was sufficient to sustain the jury's conclusion that Baten was fired without just cause, but that the jury instruction permitting damages for mental anguish was improper and may have tainted the damage award. We therefore affirm as to liability for the breach of contract, but remand for a new trial on damages alone. We reject Baten's cross-appeal asserting that the claims of intentional infliction of emotional distress and intentional interference with contract were improperly withheld from the jury.

## I.

Baten was hired by Howard University in 1973. Eventually he rose to the position of supervisor of the wage and salary administration unit of the office of personnel administration. His employment contract, by incorporation of Howard's employee handbook, provided that he could be fired only for just cause. One basis for cause was conduct incompatible with the welfare of the university, which included acts of insubordination. On September 27, 1982, Baten's supervisor, Arthur E. Newman, informed him by letter that he had been terminated on this ground. Specifically, the letter asserted that Baten, who had completed law school and been admitted to the District of Columbia Bar while employed by Howard, had "continued to use [his] office at the university to conduct both [his] law practice and real estate ventures in

spite of [Newman's] repeated warnings to [him] beginning in mid-February, 1982."

Baten's complaint alleged wrongful discharge because he claimed he had not transgressed these warnings (*i.e.*, committed insubordination) nor engaged in law-related activities in a manner prohibited by the warnings or by university policy. At trial Baten did not dispute that he performed some legal activity—unrelated to his university job—using his office facilities. Issue was thus joined on the scope of the prohibition that had been conveyed to him by the university (through Newman) and whether he disobeyed that prohibition.

Newman testified that in February and March 1982, on more than one occasion, he told Baten of information received by Dr. Nichols, Newman's supervisor, that Baten had been "practicing law out of his office." According to Newman, Baten did not deny these allegations and promised to "cease and desist." By September 1982, however, Newman was still receiving reports of Baten's law-related activities using his office, so on September 24 Newman and his administrative assistant searched Baten's office. Both testified that, while they found no materials in the office related to Baten's duties as a university employee, they found numerous legal materials. Among these were law books, case files, a telephone log of calls from clients, a legal newsletter prepared by Baten, a billing program prepared on his university computer, and stationery with a letterhead bearing his name. One of Baten's subordinates, Charles Fearing, testified that Baten made no secret of his law practice, telling "the whole office that he [had been] doing certain ... lawyer jobs[ ] for a long time. Once he ... passed the bar ... he ... did not make it a secret that he was doing something in the office, and what he was doing was trying to get his cases together." Fearing even complained to Newman that he

---

1. Baten sued on a variety of other theories as well. All but three of those counts were decided against him either on summary judgment or by directed verdict. Baten's claims for invasion of privacy against Howard University and his former supervisor at the university, Arthur Newman, and his claim for intentional interference with contract by Charles Fearing, one of Baten's subordinates, were submitted to the jury, which found for the defendants in each case. Baten cross appeals from the directed verdict on his claims of intentional infliction of emotional distress and interference with contract by Newman and a senior Howard official, Dr. Owen Nichols. See part III, *infra*.

"was getting sick and tired of phone calls all day long which assumed that this was Mr. Baten's law office." It was uncontested that Baten paid his secretary one hundred dollars to type a complaint and interrogatories for a lawsuit he brought personally against First Virginia Bank while employed at Howard.

There was, in sum, substantial evidence from which the jury could have found that Baten, despite warnings to desist, used his office to practice law when he should have been performing his job as a Howard University supervisor. But there was contrary evidence as well. Baten testified that the only warnings he received from Newman were that "people in personnel were doing outside work in their offices on university time, and that if that is occurring, it is to stop...." Baten denied that he had done more than occasional legal work from his university office, and contended he had done this on his own time—consistent with Newman's explanation to him that such use of university facilities was permitted "as long as it was ... not on university time." Indeed, according to Baten, when he showed Newman the sort of desultory legal matters he worked on in his office during lunchtime or after hours, Newman replied, "I don't see anything wrong with that."

Although Baten admitted he prepared his billing program (which he set up in anticipation of losing his Howard job through a reduction in force) and letters related to his legal services on his office word processor, he insisted that he performed these activities after hours. He explained the telephone logs as a record of phone calls made by persons interested in his legal services to a K Street office which received these calls for him; he would call the office during lunch hour to obtain a list of callers. Essentially the only law books in his office were left over from his law school attendance while he was employed by Howard. He asserted that he had worked on his lawsuit against the Virginia bank strictly on his own time; and that he had paid his secretary personally for assisting him with it.

Newman and Dr. Nichols provided partial corroboration for Baten's testimony. Each confirmed that university policy allowed employees to do at least some non-job related work at the university on their own time. When asked whether it was all right for Baten "to use the word processor before work hours or after work hours to type a newsletter or to do something related to the practice of law," Newman stated that it was, so long "as he didn't interfere with the university work that was being done on ... that machine." On the other hand, when asked whether "under university policy ... employees [could] undertake *a whole new enterprise*, such as the practice of law, using Howard University facilities" (emphasis added), even on their own time, Newman replied that they could not.

As submitted to the jury, therefore, the case presented conflicting testimony about the amount of law-related activity Baten had carried on using his university office, and whether he had disobeyed warnings repeatedly conveyed to him. Howard contends that Newman repeatedly told Baten to stop "practicing law" from his campus office;[2] that Baten did not deny that activity and ignored the warnings; and that, in any event, the evidence was compelling that he converted his workplace into a *de facto* law office. But Baten disputed each of these aspects of Howard's explanation for firing him, contending that his legal work had been incidental— nothing like the "whole new enterprise" to which Newman referred—and had been done on his own time, and that nothing in university policy as communicated to him by Newman barred that activity.

On this record, we simply are unable to hold that the issue of whether Baten was fired with justifiable cause should have been taken from the jury. As we have often said, a judgment notwithstanding the verdict "is proper only in 'extreme' cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party." *Law v. Howard Univ., Inc.*, 558

---

**2.** The jury was instructed "that one engages in the practice of law if one undertakes to conduct lawsuits for clients, or to advise as to the prose-

cution or defense of lawsuits, or as to legal rights and obligations in other matters."

A.2d 355, 355 (D.C.1989) (quoting *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990)). This court's task (like that of the trial judge in ruling on a motion for judgment NOV) is not to substitute its own inferences for those the jury could rationally draw from the evidence, or to assess the reliability of the evidence save in the rare case where testimony is "inherently incredible," *Baltimore v. B.F. Goodrich Co.,* 490 A.2d 642, 644 (D.C.1985), something we cannot say of Baten's account of his conduct and the warnings given him. "Courts must leave for the factfinder's assessment a great variety of dubious factual claims." *Alley v. Dodge Hotel,* 179 U.S.App.D.C. 256, 261, 551 F.2d 442, 447, *cert. denied,* 431 U.S. 958, 97 S.Ct. 2684, 53 L.Ed.2d 277 (1977). Baten's denial that he was practicing law on university time may be one of them, but the trial judge correctly refused to set aside the jury's finding of liability.

## II.

Over the objection of Howard's counsel, the trial judge instructed the jury that in deciding what damages to award, it could consider any "mental anguish" Baten suffered as a result of the breach of his employment contract.[3] This was error, requiring a new trial on the issue of damages.

"[T]he damages which are normally recoverable in actions for breach of contract are those which arise directly from the breach itself, or could reasonably have been in contemplation of both parties when they made the contract...." *Phenix–Georgetown, Inc. v. Charles H. Tompkins Co.,* 477 A.2d 215, 225 (D.C.1984). We have stated that,

> [a]s a general rule, damages for mental anguish suffered by reason of the breach [of a contract] are not recoverable. Some type of mental anguish, anxiety, or distress is apt to result from the breach of any contract which causes pecuniary loss. Yet damages therefor are deemed to be too remote to have been in the contemplation of the parties at the time the contract was entered into to be considered as an element of compensatory damages. This rule of law seems to be well-established.

*Pfeffer v. Ernst,* 82 A.2d 763, 764 (D.C.1951) (citation omitted). In *Asuncion v. Columbia Hosp. for Women,* 514 A.2d 1187 (D.C.1986), we recognized that this discussion in *Pfeffer v. Ernst* was dictum, and found no "binding authority in this jurisdiction speaking to the availability of damages for emotional injury in a contract action." *Id.* at 1190. Nevertheless, we acknowledged "the traditional rule ... that mental anguish is not a compensable injury in a contract action," *id.,* and went on to refuse to depart from that rule at least in circumstances—exhibited in *Asuncion*—where a plaintiff could not recover emotional damages under evolving *tort* standards of recovery for emotional distress. *Id.* at 1190–91.[4] Baten does not seek to distin-

---

3. The instruction stated, in part:

> If ... you find in favor of the Plaintiff, then, in assessing the damages to which he is entitled, you may take into consideration any of the following which you believe proximately resulted from ... the breach of contract by Howard University....:
>
> The [e]ffects such injuries had on the overall physical and mental health and well-being of the Plaintiff, any mental anguish the Plaintiff has suffered, any expenses that the Plaintiff will probably incur in the future for mental health, any loss of earning that [has] been suffered by the Plaintiff, any loss of earnings or earning capacity that the Plaintiff will probably suffer in the future.

The judge went on to define "compensatory damages" to include "[s]uch sum as will fairly compensate [the Plaintiff] for the mental anguish, the stress and humiliation, if any, which you find

resulted directly from the acts of the Defendant...."

4. Specifically, *Asuncion* was a medical malpractice action in which appellant argued for recovery on theories of negligent infliction of emotional distress and breach of contract. Since appellant failed to allege or proffer evidence of an essential element of her negligence theory, *i.e.,* that her emotional distress was medically diagnosable and medically significant, we sustained the trial court's grant of summary judgment in favor of the defendants. Nevertheless, appellant argued that in considering the contract claim, the court should follow the modern tort law trend of allowing recovery for emotional distress without regard to physical injury. 514 A.2d at 1190. We declined to do so, observing that it would not be appropriate to circumvent this jurisdiction's tort law policies by allowing recovery in contract where recovery on a tort theory would be precluded. *Id.* at 1191.

guish himself in this regard from the plaintiff in *Asuncion.* In light of *Asuncion* and *Pfeffer v. Ernst,* therefore, we conclude that the trial judge erred here in permitting the jury to award damages for mental anguish on Baten's breach of contract claim.[5]

■ Baten points out, however, that his *prima facie* entitlement to damages in this action for breach of an employment contract was subject to the defense of mitigation of damages, *District of Columbia v. Jones,* 442 A.2d 512, 524 (D.C.1982), and from this he argues that the jury could properly consider his emotional injury (specifically, the post-firing depression for which he was treated by a psychologist) to explain why he had not earned income as an attorney comparable to his former salary as a Howard employee or to the salary of an average attorney. The short answer to this contention is that the trial judge, although it was she who initially suggested the evidentiary link between Baten's mental condition and his failure to mitigate damages, never instructed the jury in accordance with the theory, nor did Baten request that she do so. Instead, as indicated above, the judge told the jury straightforwardly (and erroneously) that it could award damages for mental anguish as a component of any compensable injury Baten suffered from the breach of contract. We may not sustain the jury's consideration of mental anguish on a theory on which it was never instructed.[6]

■ Baten further argues that reversal is not required because we do not know whether the awarded damages actually included mental anguish in addition to other, valid damage components such as loss of earning capacity. He points out that he expressly asked the trial judge to separate lost earnings and mental anguish under the breach of contract count on the verdict form to avoid the problem we now face—*i.e.*, not knowing whether the jury awarded damages for the latter on this count—and that the judge declined to do so after objection by Howard's counsel. Baten therefore argues that Howard waived the issue of the erroneous damage instruction under this court's decision in *Nimetz v. Cappadona,* 596 A.2d 603 (D.C. 1991). While this argument is not insubstantial, we conclude that Howard has not waived the issue of the erroneous instruction in the circumstances of this case.

In *Nimetz* we held that "a defendant who fails to request a special verdict form [or opposes a request for a special verdict] in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury." *Id.* at 608. Howard argues that *Nimetz* is inapplicable to this case because the judge's instruction here (to which Howard objected) placed an erroneous *legal* theory of damages before the jury rather than merely a "factual theory unsupported by the evidence." This is not a frivolous distinction,

---

5. We note also that the state courts overwhelmingly have barred damages for mental anguish in cases alleging breach of an employment contract. *E.g., Fogleman v. Peruvian Assocs.,* 127 Ariz. 504, 622 P.2d 63, 65 (Ct.App.1980); *Adams v. Frontier Airlines Fed. Credit Union,* 691 P.2d 352, 354 (Colo.Ct.App.1984); *DeMarco v. Publix Super Markets, Inc.,* 360 So.2d 134, 136 (Fla.Dist.Ct. App.1978), *cert. denied,* 367 So.2d 1123 (Fla. 1979); *Valentine v. General Am. Credit, Inc.,* 420 Mich. 256, 362 N.W.2d 628, 629–31 (1984); *Silva v. Albuquerque Assembly & Distribution Freeport Warehouse Corp.,* 106 N.M. 19, 738 P.2d 513, 514 (1987); *Myrtle Springs Reverted Indep. School Dist. v. Hogan,* 705 S.W.2d 707, 710 (Tex. Ct.App.1985), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1350, 94 L.Ed.2d 520 (1987); *Gaglidari v. Denny's Restaurants, Inc.,* 117 Wash.2d 426, 815 P.2d 1362, 1370 (1991); *Bourque v. Wausau Hosp. Center,* 145 Wis.2d 589, 427 N.W.2d 433, 436 n. 2 (Ct.App.1988).

6. We decline to decide whether it would have been proper for the jury, if instructed in keeping with the theory, to consider mental anguish or depression resulting from the loss of job as a reason why Baten had failed to mitigate his damages. It is not apparent to us that Baten even laid the proper evidentiary foundation for such an instruction. Baten offered no evidence linking emotional distress or depression suffered by himself to his diminished income as a lawyer. In the new trial on damages, the trial judge is free to consider the admissibility of mental anguish testimony on this theory should Howard raise the defense of failure to mitigate and should Baten proffer expert testimony linking his post-firing depression to his failure to achieve his former income.

for the Supreme Court has itself applied it in refusing to set aside a general verdict of guilty in a criminal case where the jury may have relied upon merely "a factually inadequate theory" rather than one "contrary to law." *Griffin v. United States,* —— U.S. ——, ——, 112 S.Ct. 466, 474, 116 L.Ed.2d 371 (1991). *See also Nimetz,* 596 A.2d at 611 (Farrell, J., concurring) (absent request by defendant for special verdict insuring that finding of negligence rests on theory supported by evidence, "there is no unfairness in assuming that juries rest their conclusions on theories founded in the evidence"). Thus, while in *Nimetz,* despite the absence of a special verdict form which the defendant had opposed, it was reasonable to assume the jury analyzed the "factual import of the evidence" properly since jurors "are well equipped" to do so, *Griffin,* —— U.S. at ——, 112 S.Ct. at 474 (italics deleted), "there is no reason" in this case—so Howard may argue—"to think that [the jurors'] own intelligence and expertise ... save[d] them from [the] error" of awarding legally improper damages. *Id.*

We need not rest our decision on this distinction, however, because in this case— unlike in *Nimetz*—we are not convinced that the defendant bore primary responsibility for the fact that the case was submitted to the jury without a special verdict form on damages. Even before Baten's request for separate treatment of the two elements and Howard's objection, the trial judge had firmly indicated her belief that "[t]here's only one determination that must be made relative to damages.... If there was a breach of contract, [the question is] are you [plaintiff] entitled to ... monetary and emotional damages...."[7] More importantly, after Baten renewed his prescient concern that combining the mental anguish and lost earnings

components might result in reversal on appeal, the judge repeated her disinclination to "break it up" and raised the mitigation theory—discussed earlier—that Baten's "mental health damage ... affected [his] ability to practice law at the average level of an average lawyer...." Baten reacted to this suggestion that in the way he had "structured [his] case" mental anguish and lost earnings were "interrelate[d]" and "interlocked" by stating: "I think your Honor convinced me. I think I like that argument. I think the Court of Appeals will buy that one." Of course, as explained above, the judge never instructed on this theory, but the significant point is that Baten now agreed with the judge that separation of the damage components would impair his case. Thus, when the judge went on to instruct the jury that "[y]ou are not to return a separate sum for each element [*i.e.,* mental anguish, stress and humiliation, and injury to earning capacity] that I have mentioned, but [rather] ... a compensatory verdict in one amount," Baten made no objection and did not again ask for separation of these elements on the verdict form.

In these circumstances, Baten must share at least equal responsibility with Howard for the court's failure to insure separate verdicts on mental anguish and lost earning capacity, and we conclude that it would be unfair to apply the waiver rule of *Nimetz* on these facts. Consequently, because the jury over Howard's objection may have awarded damages for mental anguish unauthorized by law on Baten's claim of breach of contract, we must reverse and remand for a new trial on damages alone.[8]

### III.

The remaining contentions of the parties in the appeal and cross-appeal can be dealt with

---

7. Indeed, Baten's attorney—who assisted the *pro se* plaintiff in trying the case—had encouraged the judge in this conclusion by insisting colorfully (though somewhat mixing his apiarian metaphors): "[A]ll those [damage components] are like ... having honey. You can't separate one part of it from another. All of it's sweet. Pain, suffering, humiliation, that language, all of that is in one ball of wax." At trial Baten was represented by a different attorney than on appeal.

8. We reject Howard's argument that the erroneous instruction on damages requires a new trial on liability as well. This is not a case in which the jury heard potentially inflammatory testimony about Baten's emotional injuries which it should not have heard. The expert testimony about Baten's mental and emotional state following his discharge was properly before the jury in regard to the claims of intentional infliction of emotional distress and interference with contractual relations, even though the judge later directed a verdict on these counts wholly or in part.

briefly. First, the trial judge did not abuse her discretion in denying Howard's motion for a new trial based on alleged misconduct by Baten's attorney. *Queen v. District of Columbia Transit Sys., Inc.*, 364 A.2d 145, 148 (D.C.1976). Second, no rational juror could have reasonably found Howard's conduct in firing Baten to be "extreme and outrageous"; hence Howard's motion for directed verdict on the count of intentional infliction of emotional distress was correctly granted. *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C.1984). Third, although agents of a principal or officers of a corporation may be held liable for interference with the corporation's contracts with third parties, *Nickens v. Labor Agency of Metro. Washington*, 600 A.2d 813, 819–20 (D.C.1991), there was no evidence from which the jury reasonably could have found that either Newman or Dr. Nichols acted maliciously or for their own benefit in firing Baten, *id.* at 820;[9] hence Howard's motion for a directed verdict on the count of intentional interference with contractual relations was properly granted.

Accordingly, the judgment is vacated and the case is remanded for retrial on damages alone.

*So ordered.*

9. Nothing in the evidence is sufficient to support a rational conclusion that Nichols or Newman had Baten fired in order to install Dr. Thomas Groce in his position. Nor is there any support for a conclusion that a proposed reduction of the salary for Baten's position was designed to force him to quit. Indeed, the proposal was never adopted.