Sherron ANDERSON, Appellant,

v.

DISTRICT OF COLUMBIA HOUSING AUTHORITY, and Olaremi Abidoye, Appellees.

No. 05–CV–275.

District of Columbia Court of Appeals.

Argued Nov. 28, 2006.

Decided May 3, 2007.

---

Nathan A. Neal, Supervising Attorney, D.C. Law Students in Court Program, with

whom Ann Marie Hay, Executive Director, D.C. Law Students in Court Program, was on the brief, for appellant.

Frederick A. Douglas, Washington, with whom Monica E. Monroe, Margaret McFarland, and Hans Froelicher, IV, were on the brief, for appellees.

Olaremi Abidoye, pro se, did not file a brief.

Before FARRELL, RUIZ, and BLACKBURNE–RIGSBY, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

In this appeal, the tenant, Ms. Sherron Anderson, seeks to recover 100% of a $6,210 rent abatement awarded by the trial judge due to numerous housing code violations in her rental unit, including the portion of the rent paid by the District of Columbia Housing Authority ("DCHA"), pursuant to the Section 8 Program. We conclude that because the total abatement exceeds the sum of the rental payments Ms. Anderson made, her award must be limited to $234, her contribution of the total rent paid for her unit during the course of her tenancy. To conclude otherwise would turn over to the tenant public funds earmarked to provide rental assistance to low income tenants. Accordingly, we affirm.

## I. Factual and Procedural Background

Ms. Anderson signed a lease, which commenced on December 12, 2000, for a house located on 2nd Street, N.E., in Washington, D.C. She leased the house pursuant to the federal government's Department of Housing and Urban Development ("HUD") Housing Choice Voucher Program ("HCVP"), most commonly referred to as the "Section 8" Program. The Section 8 Program distributes federal funds to local public housing agencies for the purpose of providing rental assistance on behalf of low income families. DCHA is the local agency responsible for administering Section 8 funds to low income tenants in the District of Columbia.

In order to receive Section 8 funds for the rental of his house, Mr. Olaremi Abidoye, the landlord, entered into a Housing Assistance Payment Contract ("HAP contract") with DCHA. According to the terms and conditions of the HAP contract, the monthly rent Mr. Abidoye was to receive for his house, which Ms. Anderson rented, was $1,350.[1] Of this total rent amount, Ms. Anderson was responsible for paying $78 per month to Mr. Abidoye, and DCHA was responsible for paying the remaining portion of the rent, $1,272, to Mr. Abidoye. According to the HAP contract, the Section 8 funds were required to be paid by DCHA directly to the landlord and not to the tenant.

Ms. Anderson paid her portion of the rent[2] to Mr. Abidoye for January, February, and March 2001, but withheld her portion of the rent after March 2001 because she alleged the existence of numerous housing code violations. Although Ms. Anderson stopped paying her portion of the rent after March 2001, DCHA continued to pay its share of the rent to Mr. Abidoye until June 2001. However, after two inspections by DCHA, Mr. Abidoye was notified on June 21, 2001 that the

---

1. The lease between Ms. Anderson and Mr. Abidoye also stated that the total monthly market rent for the premises was $1,350.

2. During the course of the entire rental period, she only made three rental payments for January, February, and March 2001 of $78 each, totaling $234. DCHA made seven payments, for the months of December 2000, January, February, March, April, May, and June 2001, totaling $8,650.

HAP contract and the rent subsidy paid to him by DCHA pursuant to the HAP contract, would be terminated on August 31, 2001 because of the poor condition of the premises, specifically Housing Quality Standard ("HQS") repairs that had not been completed. Although no rent was paid to Mr. Abidoye by DCHA or Ms. Anderson after June 2001, she continued to occupy the premises until November 11, 2001.[3]

On August 20, 2001, the landlord, Mr. Abidoye, filed a complaint for possession of the premises against Ms. Anderson in the Landlord and Tenant Branch of the Superior Court, seeking possession of her unit, as well as a money judgment for her failure to pay rent from March 2001 through November 2001.[4] Ms. Anderson counterclaimed,[5] alleging a breach of the implied warranty of habitability due to numerous housing code violations,[6] the existence of which she argued rendered her lease void from its inception. She also sought an abatement and return of all rent, including the Section 8 subsidy paid on her behalf by DCHA to the landlord.[7]

The trial court concluded that based on the poor condition of the home from the inception of the lease until November 11, 2001, the rent should have been substantially less than the lease amount charged by the landlord. As such, the trial judge conducted a month-by-month analysis to calculate a reasonable rebate and the corresponding abatement of the rent because

3. As a result of the housing violations, and the landlord's failure to abate them, Ms. Anderson claimed that she was constructively evicted on November 11, 2001.

4. The trial court entered a default judgment for possession and money judgment against Ms. Anderson because she failed to appear in court on the initial return date. However, the trial court later determined that she did not receive service of process and granted Ms. Anderson's Motion to Vacate the Default Judgment, and the Answer, Counterclaim, and Jury Demand were accepted for filing. Pursuant to Super. Ct. L & T R. 6, the case was then certified to the Civil Division of the Superior Court.

5. In addition to the remedies available to Ms. Anderson pursuant to her counterclaim, as a Section 8 tenant, Ms. Anderson had other remedies available to her under the federal housing regulations. For example, pursuant to 24 C.F.R. § 982.456(b)(2) (1999), Ms. Anderson had the right to seek enforcement of any right or remedy against Mr. Abidoye under the terms of her lease, including enforcement of the landlord's obligations under the tenancy addendum, which is included both in the HAP contract between DCHA and the landlord, and in the lease between Ms. Anderson and Mr. Abidoye.

6. Appellant alleged, *inter alia,* that the following housing defects existed: flooding in her basement, which resulted in a noxious odor that emanated throughout the premises; a damaged furnace that became completely inoperable in February 2001, and resulted in appellant and her family having no heat or hot water during the remainder of her tenancy; an inoperable basement bathroom; the basement exterior door was ill-fitted and damaged; the unit did not have central air conditioning; the first floor front exterior screen door was ill-fitted; the first floor living room had unfinished walls and ceilings, and peeling plaster; the kitchen sink was not secured to the wall and the counter top, causing water to leak from it; insects and vermin entering the premises; and numerous other housing defects.

7. On November 9, 2001, the landlord failed to appear at the Initial Scheduling Conference on his complaint against Ms. Anderson for non-payment of rent. As a result, the trial court dismissed the landlord's complaint and entered a default on Ms. Anderson's counterclaim, and scheduled the matter for an *ex parte* proof hearing to ascertain Ms. Anderson's damages. During the subsequent *ex parte* hearings, Ms. Anderson provided evidence of a number of housing code violations, and requested a 100% abatement of the contract market rent for her apartment to be returned to her.

of the uninhabitability of the premises. The trial judge calculated a total abatement of $6,210, but limited the portion of the abatement Ms. Anderson received to $234.

Ms. Anderson filed her first appeal in this case on April 24, 2002, claiming that she was entitled to the full amount of the rental abatement, $6,210, which included DCHA's portion of the rental payment. *See Anderson v. Abidoye*, 824 A.2d 42 (D.C.2003) (hereinafter *"Abidoye I"*). In *Abidoye I*, we held that remand was required to determine whether HUD or DCHA sought repayment of the Section 8 funds paid toward Ms. Anderson's rent.[8] On remand, DCHA sought, and was granted, the right to intervene. DCHA filed an Amended Complaint for Declaratory Judgment, and moved for Summary Judgment with respect to $5,976 of the rental abatement.[9] In an Order dated March 1, 2005, the trial court granted DCHA's Motion for Summary Judgment and awarded DCHA the sum of $5,976. This amount, the trial court concluded, represented DCHA's contribution towards Ms. Anderson's rent pursuant to the Section 8 Program.[10] Ms. Anderson filed a timely appeal from the grant of summary judgment.

## II. Analysis

### A. Ms. Anderson's Abatement was Properly Limited to the Amount of Rent She Paid to the Landlord.

Ms. Anderson disputes the trial judge's apportionment of the abatement, which limited her recovery to $234, and contends that she is entitled to recover 100% of the abatement award ($6,210) on four alternative grounds. First, she contends that she is entitled to the full rental abatement award because she did not receive the benefit of her bargain. Specifically, she contends that she bargained for a housing unit worth $1,350, which was in a habitable condition. Second, she argues that DCHA never brought a cause of action adjudicating whether the landlord breached the HAP contact with DCHA and therefore DCHA never obtained a proper determination entitling it to recover a portion of the abatement. Third, she argues that she is a third party beneficiary under the HAP contract, and as such, is entitled to claim rights to the HUD subsidy paid by DCHA to her landlord. Fourth, she contends that DCHA's Section 8 subsidy payments lost their characterization as public funds once DCHA made the rental payments to the landlord on her behalf. We do not agree that Ms. Anderson is entitled to recover under any of these theories.

8. In *Abidoye I*, appellant argued that the trial court erred in limiting her award to the amount she paid in rent and that she was entitled to receive the portion of the abatement applied to the subsidized rent paid by DCHA. We held:

> We cannot tell on this record whether HUD or its local .agent, DCHA, entered an appearance and pursued or abandoned any interest it had in the disputed funds. Accordingly, consistent with *Multi–Family [Mgmt. Inc. v. Hancock*, 664 A.2d 1210 (D.C.1995)], the judgment leaving the HUD payment in the hands of the landlord is reversed and the case is remanded for a determination [of] whether HUD or DCHA seeks repayment.

824 A.2d at 44 (citations omitted).

9. The amount that DCHA sought represented the remaining rent abatement found by the trial

court in its March 26, 2002 Order. Although the trial court did not specifically mention this amount in its March 26th Order, in *Abidoye I*, we determined this amount to be $5,976, and all parties agreed that this amount is accurate.

10. In the trial court's view, these funds, "remain public funds even though they are no longer being used to subsidize [her] rent ... [and] it would be inappropriate to award the funds to [Ms. Anderson], and [they] should be returned to the government."

Whether Ms. Anderson is entitled to DCHA's portion of the rental abatement under either theory of recovery she asserts is a question of law. We review questions of law *de novo*. *See Technical Land, Inc., v. Firemen's Ins. Co.*, 756 A.2d 439 (D.C.2000); *United States v. Felder*, 548 A.2d 57, 61 (D.C.1988) ("The trial court's resolution of a question of law is entitled to no deference and is reviewed '*de novo*'on appeal. [We] will make an independent judgment based upon an original appraisal of the record.") (citations omitted).

## 1. Ms. Anderson Received the Benefit of Her Bargain.

■ Ms. Anderson contends that the landlord's breach of the implied warranty of habitability deprived her of the benefit of her bargain. Ms. Anderson argues that what she bargained for in this lease was a decent and clean unit, free of code violations, and valued at $1,350 per month, not $234. Whether she paid all or just a portion of the rent is irrelevant, she argues. However, we reject that argument in circumstances where a public agency such as DCHA has asserted a claim to payments it has made on Ms. Anderson's behalf.

District of Columbia law implies into all residential leases a warranty of habitability, requiring the landlord to maintain the premises in compliance with the District of Columbia Housing Code. *See* 14 DCMR § 301.1 (1991); [11] *see also Javins v. First Nat'l Realty Corp.*, 138 U.S.App. D.C. 369, 370–71, 428 F.2d 1071, 1072, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) ("[A] warranty of habitability, measured by the standards set out in the Housing Regulations for the District of Colum-

bia, is implied by operation of law into leases of urban dwelling units covered by those Regulations and breach of this warranty gives rise to the usual remedies for breach of contract."). Appellant was awarded an abatement because the trial court found that the landlord breached the implied warranty of habitability by failing to maintain the premises free of housing code violations. The trial court found that, due to housing code defects, the leased premises were valued at far less than the amount the landlord was receiving, and as a result, the rent should have been substantially less than the total amount the landlord received in rent for the unit. *See, e.g., Javins, supra*, 428 F.2d at 1082 ("[T]he tenant's obligation to pay rent is dependent upon the landlord's performance of his obligations, including his warranty to maintain the premises in habitable condition."); *Abidoye I, supra*, 824 A.2d at 44 (finding that as between a landlord who failed to maintain the leased premises and a tenant who did not receive what she bargained for, the landlord should not profit from his breach of the implied warranty of habitability).

Appellant mistakenly relies on *Multi–Family Mgmt. v. Hancock*, 664 A.2d 1210 (D.C.1995) and *Cruz Mgmt. Co. v. Wideman*, 417 Mass. 771, 633 N.E.2d 384 (1994), in support of her contentions. In *Multi–Family*, the landlord sued the tenant for possession of the apartment based on failure to pay rent and the tenant filed a counterclaim, alleging the existence of housing code violations. The trial court found that there were housing code violations and, acting *sua sponte*, ordered rent abatements and apportioned between the tenant and HUD a percentage represent-

---

11. 14 DCMR § 301.1 provides:
 IMPLIED WARRANTY AND OTHER REMEDIES
 301.1 There shall be deemed to be included in the terms of any lease or rental agree-

ment covering a habitation an implied warranty that the owner will maintain the premises in compliance with this subtitle.

ing the portion of the rent each paid for the unit. The court then ordered the landlord to pay these respective amounts to the tenant and to HUD, even though HUD was *never* a party to the litigation. The tenant in *Multi–Family* appealed the trial court's decision, claiming the right to 100% of the abatement on two alternative grounds. First, the tenant claimed he was entitled to the benefit of his bargain by receiving rent abatements based on the rent called for in the lease, not on the lower amount he actually paid as a participant in the Section 8 Program. Second, the tenant claimed entitlement to the abatement as a third party beneficiary of the HAP contract between the landlord and HUD. *Multi–Family, supra,* 664 A.2d at 1212.

In *Multi–Family,*[12] we remanded the case to invite HUD to assert its rights, if any, to the abatement funds. Judge Ferren, in his dissent, recognized that because HUD contributed a major portion of the rent, it may have been entitled, if it sought it, to recover from the tenant the portion of the abatements attributable to HUD subsidies, based on an unjust enrichment theory. *Multi–Family, supra,* 664 A.2d at 1222 (Ferren, J., dissenting). However, *absent a claim asserted by HUD or DCHA,* as between the landlord and the tenant, Judge Ferren noted that the tenant was entitled to 100% of the court-ordered abatements, including the portion the court ordered paid to HUD. *Id.* at 1221.

In sharp contrast to *Multi–Family,* here DCHA has asserted its rights to the portion of the rental abatement corresponding to the payments it made toward's appel-

lant's rent, and DCHA *is* a party to this matter. Allocating 100% of the abatement to Ms. Anderson would award to her an amount exceeding what she paid to the landlord and arguably would constitute the unjust enrichment contemplated by Judge Ferren in his dissent in *Multi–Family.* DCHA is entitled to recover the portion of the abatement attributable to the HUD subsidy it paid on Ms. Anderson's behalf, namely $5,976.

Another important factor that distinguishes this case from *Multi–Family* is the fact that DCHA notified the landlord of the housing code violations and gave the landlord time to cure these violations. When the landlord failed to cure the violations, DCHA advised the landlord on June 13, 2001 that the Section 8 payments he received for the unit were suspended effective June 7, 2001. Eight days later, in a letter dated June 21, 2001, DCHA advised the landlord that a subsequent inspection of the property revealed that the housing deficiencies were not resolved and therefore, effective August 31, 2001, DCHA was terminating rent subsidy payments for failure to meet the Housing Quality Standards ("HQS") in compliance with the HAP contract. In *Multi–Family,* no action was taken by DCHA to enforce its rights under the HAP contract. As such, appellant's reliance on *Multi–Family* is misplaced.

Appellant's reliance on *Cruz Mgmt. Co. v. Wideman, supra,* is similarly misplaced.[13] In *Cruz,* a Section 8 tenant filed a counterclaim against her landlord for breach of the implied warranty of habitability, alleging various housing code defects. Finding that the landlord had

---

12. *Multi–Family* was a plurality decision. Judge Ferren's opinion in Parts I., II., and III.B was joined by Judge Steadman, and Judge Steadman's opinion was joined by Judge Farrell. In addition, Judge Ferren wrote a dissenting opinion, which constitutes those parts not joined by either Judge Farrell or Judge Steadman.

13. Appellant acknowledges that *Cruz* is not binding precedent on this court. Nonetheless, appellant relies heavily upon its reasoning and conclusions of law.

breached the warranty of habitability, the trial court awarded damages to the tenant for the breach, measured by the difference between the value of the dwelling as warranted (the rent provided for in the lease) and the value of the dwelling as it existed in its defective condition. The Massachusetts Housing Finance Agency (MHFA) was not a party to the litigation during trial, but moved to intervene after the trial had been completed. MHFA appealed alleging that the trial court should have limited the tenant's breach of warranty damages to the portion of the rent the tenant personally paid to the landlord. *Cruz, supra,* 633 N.E.2d at 387. The Massachusetts court held that since MHFA intervened after the trial had been completed, the record furnished no indication of which rights, if any, MHFA attempted to assert against the landlord. *Id.* at 389. The court found significant that the record, for example, did not show whether MHFA notified the landlord that conditions in the tenant's apartment were unsafe and unsanitary, or whether MHFA had advised the landlord that it intended to terminate or suspend subsidy payments on the tenant's behalf because of the landlord's failure to correct the violations. *Id.* The *Cruz* court further noted:

> The terms of the HAP contract, and the applicable Federal regulation, clearly require a State housing agency, like MHFA, to provide notice and an opportunity to cure a default before subsidy payments may be abated. Since the record does not permit us to conclude that MHFA *has properly asserted its rights,* there is no basis in this case to conclude that a full award of damages [to the tenants] will affect MHFA's position or rights under its contracts or Federal regulations.

*Cruz, supra,* 633 N.E.2d at 389 (emphasis added).

MHFA intervened only to assert its position that the tenant's recovery should be limited to the amount of rent the tenant personally paid to the landlord. MHFA never asserted any rights to any portion of the breach of warranty damages awarded to the tenant. In contrast, DCHA has asserted its rights to the portion of the abatement representing the money it paid to the landlord on behalf of Ms. Anderson. *See Cruz, supra,* 633 N.E.2d at 387 n. 7. In accordance with the terms of the HAP contract, DCHA twice notified the landlord, in writing, of its failure to comply with HQS. DCHA gave the landlord time to cure the housing defects before ultimately terminating the HAP contract on August 31, 2001. The actions taken by DCHA are in sharp contrast with those taken by MHFA in *Cruz,* despite the fact that the HAP contract between MHFA and HUD contains similar, if not identical, provisions to those contained in the HAP contract in this case. Thus, this court is not faced with the uncertainty found by the Massachusetts court in *Cruz* regarding what rights, if any, DCHA attempted to assert against the landlord.

Unlike in *Cruz,* where the Massachusetts court was faced with determining the proper measure of damages that the landlord had to pay for breach of its obligations to the tenant, *see* 633 N.E.2d at 387 n. 7, here the question is one of allocation of those damages as between the tenant and DCHA. Neither the *Cruz* court, nor the court in *Multi–Family,* contemplated awarding to a tenant a rental abatement that represented more than what the tenant actually paid in rent where the public housing agency also claims contract damages for the same breach.[14] Although

**14.** Appellant does not cite any cases in this jurisdiction, or others, where such a payout was ordered.

we agree with Ms. Anderson, as did the trial court, that she was entitled to a unit in a habitable condition, and that as a result of numerous housing code violations in her unit, she did not receive the benefit of her bargain, vis-a-vis DCHA, she is not entitled to receive moneys paid by DCHA pursuant to the Section 8 Program, regardless of the diminished value of the unit she occupied.

## 2. The Landlord's Breach of the Implied Warranty of Habitability Constituted a Breach of the HAP Contract.

■ Ms. Anderson contends that DCHA has never brought a cause of action to adjudicate whether the landlord breached the HAP contract with DCHA. She argues that, absent litigation of a cause of action by DCHA and a determination that the landlord breached the HAP contract, she is entitled to recover the total abatement awarded by the trial court for the breach of the HAP contract. We disagree because the landlord's breach of the implied warranty of habitability also constituted a breach of the HAP contract, and a breach of the HAP contract entitled DCHA to exercise its rights against the landlord under the HAP contract.

While the HAP contract was entered into between DCHA and the landlord, several paragraphs in the HAP contract indicate that a breach of the federal Housing Quality Standards (HQS) constitutes a breach of the HAP contract.[15] The relevant provisions of the HAP contract, demonstrating this fact, are as follows:

15. Part C, Section 17 of the HAP contract defines Housing Quality Standards (HQS) as "[t]he HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs."

16. The tenancy addendum is contained in Part C of the HAP contract and provides, *inter*

*Part B, Section 2(c), Lease of Contract Unit:* The lease for the contract unit must include word-for-word all provisions of the tenancy addendum [16] required by HUD.

* * * *

*Part B, Section 3, Maintenance, Utilities, and Other Services:*
 a. The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

* * * *

 c. If the owner does not maintain the contract unit in accordance with the HQS ... the [Public Housing Agency ("PHA")] may exercise any available remedies. PHA remedies for such breach include ... suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract.
 d. The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS ...

* * * *

*Part B, Section 8, Owner Certification:* During the term of this contract, the owner certifies that:
 a. The owner is maintaining the contract unit and premises in accordance with the HQS.
 b. The contract unit is leased to the tenant. The lease includes the tenan-

*alia,* that the terms of the lease between the owner of the premises and the tenant are in accordance with all provisions of the HAP contract between the owner and the Public Housing Agency. *See* Part C, Section 2 of the HAP contract.

cy addendum ... and is in accordance with the HAP contract and program requirements ...

* * * *

*Part B, Section 10, Owner's Breach of HAP Contract:*

a. Any of the following actions by the owner ... is a breach of the HAP contract by the owner: (1) If the owner has violated any obligation under the HAP contract, *including the owner's obligation to maintain the unit in accordance with the HQS.* (Emphasis added).

* * * *

c. The PHA's rights and remedies for owner breach of the HAP contract include *recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments,* termination of housing assistance payments and termination of the HAP contract. (Emphasis added).

d. The PHA may seek and obtain additional relief by judicial order or action ...

* * * *

*Part C, Section 7(a)(1), Maintenance, Utilities, and Other Services:* The owner must maintain the unit and premises in accordance with the HQS.

These provisions of the HAP contract make clear that the owner of the leased premises must maintain the unit in accordance with the HQS. The record supports the fact that the landlord failed to comply with the HQS provisions. Based on the

poor conditions of the premises, *see* note 6 *supra,* the trial court concluded that the rent should have been substantially less than the $1,350 charged by the landlord. DCHA took definitive steps to enforce Part B, Section 3 of the HAP contract when it notified the landlord by letter dated June 13, 2001 that his unit did not meet the HQS. Subsequently, in a letter dated June 21, 2001, DCHA notified the landlord, as well as Ms. Anderson, that an inspection of the property revealed outstanding HQS violations for which repairs had still not been made. The landlord's failure to make the repairs necessary to remedy the HQS violations resulted in a breach of the HAP contract, pursuant to Part B, Section 10(a)(1) of the HAP contract. Therefore, the landlord's failure to cure the numerous housing code violations in Ms. Anderson's unit, cited by a DCHA inspector on two occasions, effectuated a breach of the HAP contract by the landlord and gave DCHA the right to seek a rental abatement under Part B, Section 10(c) of the HAP contract for those moneys it paid to the landlord on behalf of Ms. Anderson during the time that these housing code violations went unaddressed.[17]

### 3. Ms. Anderson is Not a Third Party Beneficiary to the HAP Contract.

■ Appellant erroneously relies on *Multi–Family* to support her contention that federal and state law allows her to claim third party beneficiary rights to the HUD subsidy because the Section 8 subsidy was paid on her behalf as a low income tenant. This issue was expressly left undecided in *Multi–Family*.[18] We did note, however, that HUD was in a position to clarify whether it intended for the ten-

---

17. Part B, Section 3(e) grants DCHA the ability to "inspect the contract unit and premises at such times as [it] determines necessary, to ensure that the unit is in accordance with the HQS."

18. The tenant in *Multi–Family* also argued that he was a third party beneficiary of the HAP contract, but we declined to address the tenant's assertion because he failed to raise this argument in the trial court. *See* 664 A.2d at 1220.

ant to be a third party beneficiary of the HAP contract, by making the language in the HAP contract clear as to whether the tenant either was, or was not, a third party beneficiary.[19] *See Multi–Family, supra,* 664 A.2d at 1220. As DCHA points out, in the aftermath of *Multi–Family,* HUD revised its HAP contracts to explicitly state that tenants are *not* considered third party beneficiaries and are therefore *not* entitled to enforce any provision of the HAP contract.[20] Ms. Anderson ignores the express language in the HAP contract precluding the tenant from asserting third party beneficiary rights. Such express language was not present in the 1984 HAP contract that we analyzed in *Multi–Family.* Thus, Ms. Anderson's claim that she is entitled to the HUD subsidy as a third party bene-

ficiary of the HAP contract between DCHA and her landlord must be rejected on its face because of the plain language in the HAP contract limiting her ability to claim such status.

### 4. The Funds Which Appellant Seeks are Public Funds that Must be Returned to HUD for Their Intended Public Use.

■ Relying upon *Arbuckle v. United States,* 79 U.S.App. D.C. 282, 146 F.2d 657 (1944), at oral argument, appellant's counsel asserted that the rental payments DCHA made on Ms. Anderson's behalf lost their character as "public funds" once DCHA relinquished supervision and control over the funds by paying them over to the landlord.[21] We disagree. Contrary to

---

19. We do not, however, conclude that a tenant may *never* be a third party beneficiary to a HAP contract in this jurisdiction, and recognize that prior to the time HUD revised its HAP contracts with the express language excluding tenants as third party beneficiaries, and to the extent HAP contracts deal with lead paint hazards, tenants have successfully claimed third party status. *See, e.g., Ashton v. Pierce,* 230 U.S.App. D.C. 252, 716 F.2d 56 (1983) (in action against HUD challenging components of Lead–Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4801–4846 (1976), tenants are third-party beneficiaries of HUD Annual Contributions Contract and may enforce the duties arising under the contract); *Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981) (section 8 tenants are third party beneficiaries of HUD contract with landlords and entitled to receipt of retroactive benefits under the contracts); *McNeill v. New York City Hous. Auth.,* 719 F.Supp. 233 (S.D.N.Y.1989) (section 8 tenants are third party beneficiaries of HAP contracts in suit against local housing authority); *Zakaria v. Lincoln Property Co., No. 415,* 185 Cal.App.3d 500, 229 Cal.Rptr. 669, 674 (1986) (section 8 tenants entitled to sue as third party beneficiaries of federal housing program); *Ayala v. Boston Hous. Auth.,* 404 Mass. 689, 536 N.E.2d 1082, 1088–90 (1989) (minor children of a section 8 tenant are third party beneficiaries of HAP contracts to the extent the contract deals with lead paint hazards); *see also Arthur R. Block,*

*Enforcement of Title VI Compliance Agreements by Third Party Beneficiaries,* 18 Harv. C.R.-C.L. L.Rev. 1, 28 (1983). However, none of the above cited cases involving contracts contained the language found here in Part B, Section 12, of the HAP contract between the landlord and DCHA, which expressly bars any third party beneficiary rights on behalf of the tenant. The language in the HAP contract here, as well as the language found in 24 C.F.R. § 982.456(b)(1), lead us to conclude that Ms. Anderson is not a third party beneficiary to the HAP contract in this case.

20. Specifically, HUD inserted express language in Part B, Section 12, of the HAP contract, titled "Exclusion of Third Party Rights," which provides: "The family is not a party to or a third party beneficiary of Part B of the HAP contract. The family may not enforce any provision of Part B, and may not exercise any right or remedy against the owner or PHA under Part B." *See also* 24 C.F.R. § 982.456(b)(1) ("The family is not a party to or third party beneficiary of the HAP contract. Except as provided in paragraph (b)(2) of this section, the family may not exercise any right or remedy against the owner under the HAP contract.").

21. Appellant appears to have misread *Arbuckle,* which is inapposite to appellant's case. In

Ms. Anderson's assertion, the HUD moneys maintained their character as public funds, which DCHA used to advance the public policy interest embodied in the Section 8 Housing Program. It is undisputed that DCHA paid the landlord pursuant to the Section 8 Program, and that these funds were received by DCHA from HUD for the purpose of subsidizing rent for low income tenants seeking decent and affordable housing. Congress, with the implementation of the United States Housing Act of 1937, appropriated these funds for the purpose that they be paid to landlords to carry out the housing program and provide safe and affordable housing from private housing stock for rental by qualified persons in the Section 8 Program. *See* 42 U.S.C. § 1437 *et seq.* (1990). As such, Congress is permitted to insist that these funds are distributed and spent in the manner, and for the purpose, for which they were appropriated. *See South Dakota v. Dole,* 483 U.S. 203, 206–07, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) ("Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.')'" (*citing Fullilove v. Klutznick,* 448 U.S. 448, 474, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (opinion of Burger, C. J.)); *see also Lau v. Nichols,* 414 U.S. 563, 569, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Ivanhoe Irrigation Dist. v. McCracken,* 357 U.S. 275, 295, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); *Oklahoma v. United States Civil Serv. Comm'n,* 330 U.S. 127, 143–44, 67 S.Ct. 544, 91 L.Ed. 794 (1947); *Steward Machine Co. v. Davis,* 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937).

Although these funds were paid to the landlord to subsidize a portion of the rent for the home Ms. Anderson rented, she never acquired a legal right to these funds, which is made clear by the language of Part B, Section 12, of the HAP contract prohibiting a tenant from claiming third party beneficiary status. Allowing Ms. Anderson to keep the $5,976, representing the portion of the rent paid by DCHA, despite DCHA's asserted right to recover the Section 8 payments it made, would be contrary to the very purpose for which the funds were intended. Congress authorized the Section 8 funds for the purpose of "aiding low-income families in obtaining a decent place to live and [to] promot[e] economically mixed housing." *See* 42 U.S.C. § 1437f. There is no language in the Housing Act of 1937 authorizing the subsidized portion of rent under the Section 8 Program to be paid directly to the tenant. Pursuant to Part B, Section 7, of the HAP contract, the subsidized portion of the rent is required to be paid *directly* to the landlord by DCHA.[22]

---

fact, *Arbuckle* bolsters DCHA's argument that the rent subsidy payments it made on Ms. Anderson's behalf maintained their character as public funds. In *Arbuckle,* the salaries of three employees of the "Senate Restaurant," which was located in part in the Capitol and in part in the Senate Office Building, were paid by the United States. Although the appellants claimed that the moneys involved were not the "property" of the United States, the court held that although "not public moneys in the sense in which the ordinary revenues of government are public moneys, the[] [moneys] were nevertheless moneys of the United States in the sense of moneys which the United States controlled and which, through an instrumentality of the United States created by Congress, they disbursed." 146 F.2d at 658 (*citing Richmond F. & P.R. Co. v. McCarl,* 61 App. D.C. 290, 62 F.2d 203 (1932); *Minis v. United States.,* 40 U.S. 423, 15 Pet. 423, 10 L.Ed. 791 (1841); *Loewe v. United States,* 135 F.2d 622 (9th Cir.1943)).

**22.** For example, Part B, Section 7(a)(1) provides that "the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month."

We conclude that the funds paid to Mr. Abidoye by DCHA pursuant to the Section 8 Program remained public funds, even if the purposes for which the funds were intended were, arguably, frustrated by the landlord's breach of the implied warranty of habitability.[23] Therefore, in a case such as this, where DCHA, as the agency charged with implementing the Section 8 program, asserts its rights to recover the portion of the damages that represents the rent paid by DCHA on a tenant's behalf, the damages award is properly allocated so that the funds can be returned to the public trust for future use to, in the words of our statute, aid "low-income families in obtaining a decent place to live and of promoting economically mixed housing."[24] 42 U.S.C. § 1437f.

## B. DCHA's Intervention was Timely and Invited by this Court in *Abidoye I.*

Ms. Anderson argues that DCHA has not properly preserved or pursued its rights under the HAP contract, and therefore, DCHA should not be able to benefit from her litigation by reaping the rewards of her judgment against the landlord. We disagree with this contention and conclude

that DCHA did preserve and pursue its rights. Contrary to Ms. Anderson's assertion, DCHA did not have actual notice of the pending landlord and tenant action from its inception when it was filed in 2001. We conclude that DCHA's intervention was timely.

 A decision to grant or deny a motion to intervene is within the discretion of the trial judge. *See Emmco Ins. Co. v. White Motor Corp.,* 429 A.2d 1385 (D.C. 1981). The trial court must consider: "(1) whether the person seeking to intervene 'has an interest in the transaction which is the subject matter of the suit'; (2) whether 'the disposition of the suit may as a practical matter impair his [or her] ability to protect that interest'; and (3) whether 'his [or her] interest is adequately represented by existing parties.'" *McPherson v. D.C. Hous. Auth.,* 833 A.2d 991, 994 (D.C.2003) (citing *Calvin–Humphrey v. District of Columbia,* 340 A.2d 795, 798 (D.C.1975)). However, with respect to timeliness, Super. Ct. Civ. R. 24(b) requires that an application for intervention be "timely" filed, and if it is untimely, intervention must be denied. *See Emmco Ins. Co., supra,* 429 A.2d at 1386–387; *see also*

23. In essence, Ms. Anderson seeks compensation for having had to endure living in the undisputedly poor conditions in her home, resulting from the housing code violations caused by the landlord's breach of the implied warranty of habitability. Ms. Anderson contends that it is the tenant, and not DCHA, who suffers when the conditions in rental property violate the implied warranty of habitability. She argues that awarding the full abatement to her would prompt DCHA to more diligently enforce the provisions of the HAP contract, which require the landlord to maintain the premises in a habitable condition. Ms. Anderson is entitled to recover, as she has here, damages for the landlord's breach that resulted in the poor conditions in her home. She is not entitled to damages attributable to those funds paid by DCHA, however, where DCHA has asserted its right

to recover those funds. Nor is she entitled to recover what would in essence be a tort recovery for her "mental pain and anguish." *See Howard Univ. v. Baten,* 632 A.2d 389 (D.C.1993) (damages for mental aguish suffered by reason of breach of contract are not recoverable); *see also Phenix–Georgetown, Inc. v. Charles H. Tompkins Co.,* 477 A.2d 215, 225 (D.C.1984); *Pfeffer v. Ernst,* 82 A.2d 763 (D.C.1951).

24. At a March 26, 2004 hearing, DCHA's trial counsel stated: "Your Honor, we've got 28,-000 families on the waiting list for the section 8 program housing to attractor [sic] program. We serve about 12,000. Yes, we want every penny we can get back so that we can serve more people. This might only pay a couple of month's rent for a few people, but that's a few more than we have right now."

*NAACP v. New York,* 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973). In *Emmco Ins. Co.,* we stated that timeliness is to be determined from all the circumstances and that the court should take into consideration the following factors: (1) the length of the intervenor's delay; (2) the reason for the delay; (3) the stage to which the litigation had progressed when intervention was sought; (4) the prejudice that the original parties may suffer if the application is granted; and (5) the prejudice that the intervenor may suffer if its application is denied. 429 A.2d at 1387.

■ Under *Emmco Ins. Co.,* the length of delay is to be measured from the time that the applicant actually knew or reasonably should have known of its interest in the main action. DCHA contends that its interest in the lawsuit did not arise until after Ms. Anderson was granted an abatement and claimed entitlement to 100% of the abatement, including the portion of the rental payments made by DCHA. We agree. Contrary to appellant's assertions, DCHA did not initially have an interest, and certainly did not know of their interest, in this matter at the time the landlord filed his suit for possession of the unit. The nature of the original complaint filed by the landlord against appellant was for a suit for possession of the premises and for failure to pay rent. Such a suit in the Landlord and Tenant Branch of the Superior Court did not directly involve DCHA and we can discern no basis to conclude that DCHA should have been put on notice that the suit might necessitate their intervention. It would be unreasonable for us to conclude that DCHA should have known that the litigation might ultimately be certified to a regular civil calendar, where a trial judge would ultimately determine that the tenant was entitled to an abatement, and that the amount of the abatement would greatly exceed the amount of rent paid by the tenant, and that the tenant would claim entitlement to over $5,000 of the funds paid by DCHA. We simply cannot conclude from this record that DCHA reasonably should have known of its interest in the case.[25] Similarly, appellant's counterclaim for housing code violations did not directly involve DCHA.

Further, absent intervention, DCHA's interests would not have been represented in the suit, and DCHA would have been prejudiced by not being in a position to assert a claim that it was entitled to receive the portion of the abatement representing rent DCHA paid on Ms. Anderson's behalf. Lastly, in *Abidoye I,* we remanded the case back to the trial court with instructions that a determination be made as to whether DCHA sought repayment, and with instructions to the trial court to invite DCHA to intervene. *Abidoye I, supra,* 824 A.2d at 44. Thus, the trial judge's grant of DCHA's Motion to Intervene was not an abuse of its discretion.

## C. DCHA's Election of Remedies Under the HAP Contract Does Not Bar it from Intervening and Recovering in this Lawsuit.

■ Appellant next argues that DCHA is barred from intervening in this lawsuit

25. Appellant contends that DCHA was aware of its rights at the inception of the landlord and tenant action, and points out that DCHA's Office of General Counsel was sent a *subpoena duces tecum* requesting copies of the entire HUD Section 8 file of Ms. Anderson, as well as four additional subpoenas advising DCHA of the dates of the *ex parte* hearing, and requesting a DCHA witness to be present and additional information about the subsidy payments made by DCHA on behalf of Ms. Anderson. However, we conclude that this was not enough to put DCHA on notice that it had a specific interest in the outcome of the lawsuit, and it was when Ms. Anderson challenged the trial court's final decision not to award her the full rental abatement that DCHA's interest in the litigation arose.

when it has already elected remedies available under the HAP contract. We reject this argument. Based on the plain language of the HAP contract, DCHA's election to suspend and ultimately terminate the HAP payments to the landlord did not preclude DCHA from pursuing judicial remedies. Since this is a question of law, our review is *de novo*. *See Technical Land, supra,* 756 A.2d 439.

Ms. Anderson's argument must be rejected based on the plain language of the HAP contract. Part B, Section 10(c) of the HAP contract provides:

> The PHA's rights and remedies for owner breach of the HAP contract *include* recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. (Emphasis added).

Additionally, Section 10(d) states: "The PHA may seek and obtain additional relief by judicial order or action, including specific performance, other injunctive relief or order for damages." Finally, Section 10(f) states: "The PHA's exercise or non-exercise of any right or remedy for owner breach of the HAP contract is *not a waiver* of the right to exercise that or any other right or remedy at any time." (Emphasis added).

Clearly, if this court were to adopt Ms. Anderson's interpretation of the contract, and conclude that DCHA was limited to either electing a judicial remedy, or electing those remedies specifically enumerated in the HAP contract, Part B, Sections 10(c), (d), and (f) would be rendered "useless, inexplicable, inoperative, meaningless or superfluous and, hence, should be rejected." *Intercounty Constr. Corp. v. District of Columbia,* 443 A.2d 29, 31–32 (D.C. 1982) (*citing Ball State Univ. v. United States,* 203 Ct.Cl. 291, 488 F.2d 1014, 1016 (1973)). Therefore, relying on the unam-biguous language in the HAP contract, we conclude that DCHA was permitted to terminate the HAP contract *and* pursue judicial remedies to seek return of the monies it paid to the landlord. *See 1010 Potomac Assos. v. Grocery Mfrs. of America, Inc.,* 485 A.2d 199, 205 (D.C.1984) ("If [a] document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent."); *see also Bolling Fed. Credit Union v. Cumis Insur. Soc'y, Inc.,* 475 A.2d 382, 385 (D.C.1984).

**D. DCHA is Entitled to a Judgment Based Upon its Complaint for Declaratory Judgment.**

■ Similarly, we reject appellant's final argument that DCHA is not entitled to a judgment where it has failed to state a cause of action in the Landlord and Tenant Branch of the Superior Court for a breach of the HAP contract. Specifically, appellant contends that DCHA sought to recover on a claim which is not cognizable in the Landlord and Tenant Branch of the Superior Court, and that, in essence, DCHA sought to bootstrap on their judgment, or be summarily awarded a monetary judgment, based on a potential breach of the HAP contract claim. The question of whether DCHA is permitted a judgment in this instance is a question of law, which we review *de novo*. *See Technical Land, supra,* 756 A.2d 439.

After the trial court granted DCHA the right to intervene, DCHA filed a Complaint for Declaratory Judgment on July 15, 2003, seeking to recover the portion of the rent it paid to the landlord on behalf of the appellant. Appellant argues that DCHA's claim for a declaratory judgment arising out of a landlord and tenant relationship is not cognizable in the landlord and tenant branch. This argument incorrectly characterizes claims which can be

brought in the Landlord and Tenant Branch of the Superior Court. Summary proceedings for possession of real property, claims involving personal property in the premises, and claims for money judgments based on rent arrears, may be brought in the Landlord and Tenant Branch of the Superior Court pursuant to Super. Ct. L & T R. 1 & 3.

Further, Super. Ct. L & T R. 2 makes applicable in the Landlord and Tenant Branch certain Superior Court Rules of Civil Procedure, except where those rules would be inconsistent with the provisions of the Landlord and Tenant Rules. Super. Ct. Civ. R. 57, which governs declaratory judgments, is included among the rules made applicable to, and enumerated in, Super. Ct. L & T R. 2. We do not agree with appellant that DCHA's claim for declaratory judgment is barred in the Landlord and Tenant Branch of the Superior Court. Thus, DCHA properly preserved and pursued its claim to the portion of the rent monies it paid pursuant to the Section 8 Program.

Accordingly, the trial court properly limited Ms. Anderson's rent abatement to $234, the total amount of rent she paid. Ms. Anderson was not entitled to receive the portion of the abatement representing DCHA's rental payments on her behalf pursuant to the Section 8 Program. For the aforementioned reasons, the decision of the trial court is hereby

*Affirmed.*